In re Petition for DISCIPLINARY AC-TION AGAINST David G. MOELLER, an Attorney at Law of the State of Minnesota.

No. C3–97–891.

Supreme Court of Minnesota.

July 30, 1998.

Edward J. Cleary, Director of the Office of Lawyers Professional Responsibility, Patrick R. Burns, Senior Asst. Director, St. Paul, for appellant.

Michael J. Hoover, Minneapolis, for respondent.

## OPINION

### PER CURIAM.

Attorney David G. Moeller is before this court on a petition and three supplementary petitions for disciplinary action filed by the Director of the Office of Lawyers Professional Responsibility alleging that Moeller committed approximately 30 violations of the Minnesota Rules of Professional Conduct. The alleged violations include backdating client retainer agreements and failing to explain and/or misrepresenting the dates of the agreements to judges and/or opposing counsel, altering a settlement stipulation after it was signed by opposing counsel, directing the forgery of a client's name on a retainer agreement, counseling a client to stage an accident, testifying falsely, and making false statements to a former law partner regarding an attorney lien and to the Director regarding matters under investigation. However, all of these allegations were included within one count: that Moeller engaged in a pattern of dishonesty, fraud, deceit and misrepresentation in violation of Minn. R. Prof. Conduct 3.3(a)(1) and (a)(4), 3.4(b), 4.1, 8.1(a)(1), 8.4(c) and (d). The referee filed his Findings of Fact, Conclusions of Law and Recommendation for Discipline on December 19, 1997. Because the referee recommended disbarment, this court temporarily suspended

Moeller pending our final determination of the matter. We now order disbarment.

Moeller was admitted to practice law in Minnesota in 1981 and has concentrated his practice in the areas of workers' compensation and personal injury. From February 1990 to April 1997, Moeller practiced as the sole proprietor of David G. Moeller & Associates. It was during this period of time that the conduct underlying this disciplinary action occurred.

Following a ten-day contested hearing in November and December of 1997, the referee concluded that Moeller had engaged in a pattern of dishonesty, fraud, deceit and misrepresentation in violation of Minn. R. Prof. Conduct 3.3(a)(1) and (4), 3.4(b), 4.1, 8.1(a)(1),(c)(1) and (d). In support of this conclusion, the referee made findings of fact which may be summarized as follows:

1) In six workers' compensation matters, Moeller had his clients sign settlement stipulations that falsely recited that Moeller had retainer agreements with the clients for a maximum contingent fee of $13,000, when in fact, the retainers were for $6,500.[1] After the clients signed the stipulations, Moeller then had them sign new retainer agreements providing for a $13,000 maximum contingent fee, which he backdated to a date prior to the client's settlement stipulation. In three of these cases, Moeller submitted the backdated retainer agreements for filing with the compensation judge and/or the Department of Labor and Industry (D.L.I.) without explanation and in one case, Moeller made a misleading statement to the compensation judge regarding the date the retainer agreement was executed. Additionally, Moeller made a misleading statement about the date of the retainer agreement to opposing counsel in one case and to the Director's office in another. In none of these client matters did the new retainer contain the notice required by Minn. R. 5220.2920, informing the clients that they did not have to agree to a higher fee than already agreed upon.

---

1. In one of these client matters, the client actually signed a settlement stipulation providing for a $6,500 contingent attorney fee, which Moeller later requested opposing counsel change to $13,000.

2) In a social security disability matter, Moeller submitted a backdated retainer agreement without explanation to an administrative law judge and misled the Director regarding the date on the retainer agreement.

3) In the course of representing a Minneapolis police lieutenant, Moeller altered a settlement stipulation previously signed by opposing counsel to increase the amount of his contingent fee and forwarded it to a third party for filing with D.L.I. without informing opposing counsel.

4) Moeller made misleading statements to his former law partner, Arthur W. Priesz, Jr., in a letter dated October 13, 1993, regarding his negotiations to settle a matter on which Priesz had placed an attorney's lien in the amount of $1,903.71.

5) Moeller either gave intentionally false testimony regarding the extent of his representation of a client at a March 1, 1996 hearing or filed an intentionally false attorney's lien. Moeller testified that his partner, retired Judge Donald Lais, handled the entire file when in fact, an attorney's lien reflected that he performed 73.5 hours of service and that Lais had only performed 7.05 hours.

6) Moeller submitted numerous billing statements to D.L.I. in support of requests for contingent fees which inaccurately listed the date on which work was performed, the name of the attorney who performed the work, or included bills for legal work which could not be substantiated by a review of the files.

7) On or about September 26, 1994, Moeller directed his secretary to forge a client's signature on a retainer agreement providing for a $13,000 maximum contingent fee. Moeller also performed or directed another forgery of the client's signature, which was submitted to D.L.I.

8) Moeller counseled a client to stage a workplace accident to enhance the client's ability to make a future workers' compensation claim.

On appeal to this court, Moeller does not contest the bulk of the referee's findings, and he concedes that some discipline is appropriate for his ethical violations. However, he contests the referee's findings that he was involved in the forgery of his client's signature and that he counseled a client to stage a workplace accident. Additionally, he argues that the allegation that he counseled a client to stage an accident was not properly before the referee. Moeller also argues that inaccuracies found by the referee in his billing statements did not violate the Minnesota Rules of Professional Conduct. Finally, Moeller contests the recommended discipline.[2]

■ Because Moeller timely ordered a transcript pursuant to Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR), the referee's findings are not conclusive. On review, this court will not set aside the referee's findings of fact unless they are clearly erroneous.[3] Allegations of professional misconduct must be proved by clear and convincing evidence.[4]

■ We first consider Moeller's claim that the referee's finding that he was responsible for two separate forgeries of his client's signature was not supported by clear and convincing evidence. The referee found that on or around September 26, 1994, after Moeller had client William Ferganchick execute a settlement stipulation which falsely stated that Ferganchick had signed a retainer agreement for a $13,000 maximum contingent fee, Moeller directed his secretary, Tracy Sigrid, to forge Ferganchick's signature to a retainer agreement for this amount. After registering her protest with Moeller, Sigrid performed the forgery. Two other secretaries in the law firm witnessed the forgery and were told by Sigrid that Moeller had directed her to perform the forgery and that she was

---

2. Moeller also contests the referee's conclusion that he improperly altered client Pamela Bishop's settlement stipulation because the referee did not make any findings to support this conclusion. However, because we hold that Moeller's disbarment is merited on other grounds, we find it unnecessary to address this issue.

3. *In re Strid,* 551 N.W.2d 212, 215 (Minn.1996).

4. *Id., In re Andrew,* 465 N.W.2d 576, 577 (Minn. 1991).

doing it under duress. However, this particular forged document was not filed with D.L.I. Rather, another retainer was filed which contained Ferganchick's signature forged through a "cut and paste" method. The referee also found that Moeller either performed or directed this second forgery.

In finding that Moeller directed the first forgery, the referee credited the testimony of Sigrid that Moeller directed her to perform the forgery over Moeller's conflicting testimony that he did not. Sigrid's testimony was corroborated by two secretaries, who testified that they heard Sigrid argue with Moeller and then saw Sigrid perform the forgery. This court accords deference to a referee's factual findings when they are based on weighing conflicting testimony.[5] Therefore, we uphold the referee's finding that Moeller directed the forgery.

The referee's findings as to the second forgery are supported by circumstantial evidence. For example, while Moeller knew he did not have a signed retainer agreement in the Ferganchick file for a $13,000 contingent fee, he went ahead and sent opposing counsel a settlement stipulation and statement of attorney fees which referenced an attached retainer in that amount. And, in fact, the forged retainer was attached to these documents. Further evidence that Moeller was responsible for the forged retainer is gleaned from the fact that Moeller had Ferganchick sign a new retainer identical to the forged document after the settlement stipulation was filed, but did not file this new retainer with D.L.I. This action indicates that Moeller knew that the forged retainer agreement had already been submitted. "Clear and convincing proof will be shown where the truth of the facts asserted is 'highly probable.'"[6] These circumstances, in conjunction with the fact that Moeller had ordered Sigrid to forge the first retainer agreement, make it highly probable that Moeller was responsible for the second forged document and therefore, we uphold the referee's finding on this issue.

Next, we review the referee's findings concerning the allegation that Moeller counseled a client to stage a workplace accident. The referee found that Moeller counseled client Steven Hatcher, in a taped conversation, to stage a workplace accident to enhance Hatcher's ability to make a future workers' compensation claim. Hatcher sent a tape containing the conversation to the Director's office in January 1995, as part of a complaint alleging that Moeller was negligent and rude in his representation. The complaint did not mention that Moeller had suggested that Hatcher stage an accident and the staff attorney who reviewed the complaint did not recall listening to that conversation on the tape. On February 14, 1995, the Director dismissed Hatcher's complaint without investigation.

The referee found that the Director's office had constructive knowledge of the contents of the tape at the time the complaint was dismissed. Therefore, the referee concluded that, pursuant to Rule 19(b), RLPR, the incident and evidence concerning it could not be considered to prove a separate violation of professional misconduct, but could be considered as part of a pattern of related conduct. The referee went on to conclude that the incident was part of the pattern of dishonest conduct alleged in the petition for discipline.

Rule 19(b)(1), RLPR, governs the consideration of conduct which was part of a previous disciplinary action in which discipline was found to be unwarranted. It provides:

> Conduct considered in previous lawyer disciplinary proceedings of any jurisdiction is inadmissible if it was determined in the proceedings that discipline was not warranted, except to show a pattern of related conduct the cumulative effect of which constitutes an ethical violation.[7]

In *In re Reiter*, this court applied Rule 19(b)(1), RLPR, to hold that an incident of

---

5. *In Re Hartke*, 529 N.W.2d 678, 679–80 (Minn. 1995).

6. *In re Miera*, 426 N.W.2d 850, 853 (Minn.1988) (quoting *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn.1978)).

7. Rule 19(b)(1), RLPR.

trust fund mismanagement which was brought to the Director's attention before the expiration of a prior probation and did not result in discipline could be considered with another incident of trust fund mismanagement as a pattern of behavior amounting to professional misconduct.[8] In each instance, Reiter issued checks on behalf of clients from the trust account before deposits were made to cover the checks.[9] This court held that both the pattern and the new incident of mismanagement were sanctionable violations of Minn. R. Prof. Conduct 1.15(a).[10]

Moeller argues that *Reiter* is distinguishable from the present case because it involved identical incidents of misconduct. In contrast, he contends that the allegation that he counseled a client to stage an accident is completely different from the other allegations in this disciplinary action. Therefore, he urges the court to conclude that the incident may not be considered as part of a pattern of related conduct.

However, we agree with the referee that counseling a client to commit fraud is an act of dishonesty that is related to the other acts of dishonesty alleged, such as forging a client's name, submitting misleading documents to the court, and giving false testimony. Together, they form a specific pattern of dishonesty, fraud, deceit and misrepresentation in the practice of law. Therefore, the referee properly considered the incident under Rule 19(b)(1), RLPR.

Additionally, we hold that the referee's finding that Moeller counseled his client to stage a "slip and fall" accident at work was supported by clear and convincing evidence. This court accords deference to a referee's findings when they are based in part on assessments regarding demeanor, credibility, and sincerity.[11] The referee made his finding after listening to testimony of the client's interpretation of the conversation and, more importantly, a tape of the actual conversation. This tape provided the referee the opportunity to discern the meaning of Moeller's oblique references to the client having an accident from the tenor and verbal nuances of the conversation, as well as from the words actually spoken and therefore, the referee's finding should be afforded deference. Moreover, an excerpt from the bare transcript of the conversation reveals that Moeller was not simply advising his client of the possibility of a future injury and the need to document it, as he now argues.

> Moeller: You may, ah, accidentally have a little accident in addition to just daily wear and tear.
>
> Hatcher: Um.
>
> Moeller: It could happen that you have an accident. You listening?
>
> Hatcher: Um, yeh.
>
> Moeller: Are you sure you're listening?

Our review of the evidence confirms that the referee's finding that Moeller counseled his client to stage an accident was supported by clear and convincing evidence.

Next, we consider Moeller's contention that the inaccuracies found by the referee in his billing statements were merely the result of human error and did not violate the Rules of Professional Conduct. The referee concluded that inaccuracies in Moeller's billing statements regarding the date on which work was performed, the name of the attorney who performed the work, and bills for work that could not be found in the client file constituted violations of Minn. R. Prof. Conduct 3.3(a)(1) (knowingly making false statement of fact to tribunal); 3.3(a)(4) (offering evidence known to be false); 4.1 (knowingly making a false statement of fact or law); 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation); and 8.4(d) (engaging in conduct prejudicial to the administration of justice).

This conclusion is supported by the referee's findings regarding Moeller's billing practices. The referee found that Moeller often requested his staff to create billing statements based on a target fee. When staff drafted billing statements for less than the target fee based on what they thought could

---

**8.** 567 N.W.2d 699, 702–04 (Minn.1997).

**9.** *Id.* at 702.

**10.** *Id.* at 703–04.

**11.** *In re Hartke,* 529 N.W.2d at 679–80.

be supported by the file and time records, Moeller would often return the statements to the staff with the instruction to add time. Moeller would not specify what time had been overlooked and his staff took his instructions to either be an explicit or implicit directive to fabricate billing entries. The referee went on to find that on more than three occasions, staff brought their concerns regarding the inclusion of false entries to the attention of Moeller or his office manager. For example, Michael Helebrant documented his concerns in the Lorenzen, Metcalf, and O'Connor matters. However, when legal secretary Margaret Armour voiced concern about false entries, she was told to "just do as instructed."

In contrast, Moeller argues that the inaccuracies found by the Director after reviewing approximately 300 of his D.L.I. files were caused by human error. He argues that the testimony by his former employees that he required them to falsify certain billing records is almost wholly unsubstantiated, as client matters cited by the employees as containing falsified information were not among the billing statements contested by the Director at trial. Furthermore, he explains the lack of documentation for work that was billed to clients' files as the likely result of the purging of closed files, misfiling, or the practice of "borrowing" a document from a closed file to use as a model.

We disagree. The referee's conclusions of law that the billing inaccuracies constituted knowing submissions of false information were supported by overwhelming evidence. Four former staff members testified that Moeller instructed them to falsify billing records. Moreover, former staff attorney Helebrant's testimony to this effect is corroborated by contemporaneous memoranda and other documents introduced into evidence. For example, in the O'Connor matter, a memorandum from Helebrant to Moeller was entered into evidence which stated that some of the time entries "border on being ludicrous" and that a "potential red flag for a settlement judge who is only half asleep would be that nearly 100% of this

legal time is being claimed by you yourself." This memorandum shows that inaccuracies on items such as the attorney listed on the billing statements were part of a pattern of purposeful falsification of the billing statements.

Next, Moeller argues that the inaccuracies in the billing statements do not violate the Rules of Professional Conduct because the referee found that there was no evidence that he received fees to which he was not entitled nor was there clear and convincing evidence that the total time spent on any case was overstated. Moreover, he argues that since the vast majority of the discrepancies were contained in billing statements for contingent fees that were not effected by the billing statements, they may not be the subject of discipline.

Yet, the question of whether the false statements had any material effect on the calculation of the client's bill or the reasonableness of the amount charged is irrelevant to the question of whether Moeller violated his duty of candor to the court, his clients, and the public. For example, in *In re Zotaley,* this court held that an attorney violated Minn. R. Prof. Conduct 8.4(a) and (d) in submitting misleading information to opposing counsel and an arbitrator despite the fact that the evidence was not necessarily false and the claim was not frivolous.[12] This court reasoned that the misrepresentation in itself was "prejudicial to the administration of justice because this court has long held that attorneys owe a duty of candor to the courts[.]"[13] In the instant case, Moeller's deception went further. He submitted billing statements to the workers' compensation court that he knew contained false information. This action was in clear violation of Minn. R. Prof. Conduct 3.3(a)(1) and (4), 4.1, and 8.4(c) and (d).

■ We now turn to the question of appropriate discipline. In weighing the appropriate discipline for Moeller, the referee found four aggravating factors: Moeller's four prior disciplinary sanctions; a pattern of misconduct; Moeller's submission of false re-

---

**12.** 546 N.W.2d 16, 19–20 (Minn.1996).

**13.** *Id.* at 20.

sponses to inquiries by the Director; and Moeller's substantial experience in the practice of law. The Director found Moeller's reputation as one of the top workers' compensation attorneys in Minnesota to be a mitigating factor. However, we believe that this is, at best, a neutral factor that does not mitigate Moeller's conduct.[14]

In determining the proper discipline, this court affords great weight to the referee's recommendation, but is ultimately responsible for determining the proper sanction.[15] This court typically uses four factors to determine the appropriate level of discipline: the nature of the misconduct; the cumulative weight of the disciplinary violations; the harm to the public; and the harm to the legal profession.[16] Disbarment is the most extreme sanction. However, this court will impose disbarment "when there is a continuing pattern of gross neglect of clients, misrepresentations to the court and other patterns of misconduct which constitute a great danger from which the public needs immediate protection."[17] We do not hesitate to impose harsh sanctions for dishonesty because "[p]rofessional integrity is the most important attribute of the lawyer. An attorney who deliberately deceives the court is guilty not only of obstructing the administration of justice but also of subverting that loyalty to the truth without which he cannot be a lawyer in the real sense of the word."[18]

We hold that Moeller has demonstrated a continuing and pervasive pattern of deceit and dishonesty. He has violated his duty of candor as an officer of the court and has demonstrated a marked lack of honesty in his dealings with clients and attorneys. The pervasiveness of this pattern of dishonesty is demonstrated by the fact that these violations occurred over several years and in-

volved multiple facets of Moeller's practice. Moreover, the cumulative weight of these violations is increased when viewed in light of Moeller's 1991 probation for conduct which mirrored Moeller's current violations, including skirting court approval for attorney fees in a workers' compensation appeal and submitting a petition for unsubstantiated attorney fees. Taking all of these factors together, we agree with the referee that disbarment is the appropriate discipline.[19]

Moeller argues that disbarment is inappropriate because his conduct did not result in the type of prejudice to his client's interests that has been present in other disbarment cases. However, in doing so, Moeller ignores the substantial prejudice his actions caused to the integrity of the bar and our system of justice. Moeller's repeated acts of dishonesty over the course of years demonstrate that he places members of the public at risk of future harm from which this court has a responsibility to protect them. Accordingly, we order that David G. Moeller be disbarred from the practice of law in the State of Minnesota. We further order that he pay costs in the amount of $900 to the Director of the Office of Lawyers Professional Responsibility.

14. *Compare In Re Dvorak*, 554 N.W.2d 399, 404 (Minn.1996) (this court recognized as mitigating factors attorney's substantial pro bono work and "outstanding reputation for honesty and hard work within the profession").

15. *In re Harp*, 560 N.W.2d 696, 700 (Minn.1997).

16. *In re Margolis*, 570 N.W.2d 688, 691 (Minn. 1997).

17. *In re Carey*, 380 N.W.2d 806, 809 (Minn. 1986).

18. *In re Nilva*, 266 Minn. 576, 583, 123 N.W.2d 803, 809 (1963).

19. *See, e.g, In re Graham*, 503 N.W.2d 476, 477–79 (Minn.1993) (ordering the disbarment of an attorney who fabricated retainer agreements and introduced them in his disciplinary investigation, fabricated letters and other documents for personal litigation, gave false testimony, failed to file income tax returns, and failed to cooperate with the disciplinary investigation).