STATE of Minnesota, Respondent,

v.

Arron Scott KING, Petitioner,
Appellant.

No. C9–99–298.

Supreme Court of Minnesota.

March 1, 2001.

## OPINION

### PAUL H. ANDERSON, Justice.

In this case, we are asked to determine whether testimony given at a guilty plea hearing by an alleged accomplice to a crime bears adequate indicia of reliability such that it can be admitted against a criminal defendant charged with the same crime. A Washington County jury found defendant/appellant Arron King guilty of two counts of aiding and abetting first-degree burglary. At King's trial, the state introduced a redacted version of the guilty plea testimony of King's alleged accomplice. King objected to the use of the plea testimony on the grounds that it was inadmissible hearsay and that its admission violated his Sixth Amendment Confrontation Clause rights. The court allowed the testimony and gave an instruction on the alleged accomplice's unavailability and his prior convictions. Following the guilty verdicts, the court sentenced King on one count to serve 57 months in prison. King appealed and a divided panel of the Minnesota Court of Appeals affirmed. We reverse and remand for a new trial.

Appellant Arron King was convicted of a July 15, 1998 burglary of a private residence in Grant, Minnesota. The burglarized house is in the country and is somewhat secluded. The owner resided in the upper two levels of the house, and a tenant, Andreas Koelbl, resided in the walkout basement level.

Koelbl worked evenings as a bartender, so he was often home during the afternoon. On the afternoon of July 15, Koelbl was in his apartment when he heard the homeowner's dog barking. He then heard someone knocking on the front door. When the knocking continued, he walked to his window and looked out to the driveway. He saw someone, later identified as King, in the driveway. On the day of the incident, Koelbl reported to the police that King was standing by a car in the driveway and that King began walking toward the house only after Koelbl heard a loud bang from upstairs. At trial, Koelbl testified that as he looked at King, the knocking continued. He further testified that he saw King walking toward the house, and that after Koelbl moved away from the window he heard a loud bang from upstairs.

After hearing the loud bang, Koelbl exited the house through a basement-level door. Koelbl then walked to the front of the house, where he was able to observe

that the front door was open and that the deadbolt lock was lying on the ground. He also saw an unfamiliar car parked in the driveway with the motor running, but no driver or other persons were visible. Koelbl got into the car, drove to a neighbor's house, and instructed the neighbor to call the police. Koelbl then returned to the house with the intent to block the driveway and to get a better description of whoever was involved in the burglary. Upon returning to the house, Koelbl began to pull the car into the driveway, which Koelbl estimated to be about 40 yards long. As he pulled into the driveway, Koelbl spotted King squatting by the side of the driveway.

Koelbl testified that King was closer to the house than to the street. There is conflicting testimony as to exactly where King was squatting, but he was not next to the house because that area would not have been visible from Koelbl's position at the end of the driveway. Koelbl testified that King appeared startled to see Koelbl driving what turned out to be King's car and King began motioning Koelbl to come to him. King then began to run toward Koelbl with his hand on his waistband, so Koelbl, fearing for his safety, backed the car out of the driveway and into the street. Koelbl further testified that King started to follow him, but then turned and ran off through a pasture. Koelbl subsequently spotted King's alleged accomplice, Arron Weatherspoon, running toward the same pasture. Once King and Weatherspoon were out of sight, Koelbl returned to the house, where he waited for the police.

When the police arrived, they discovered disturbed drawers and closets on the upper level of the house and in Koelbl's basement apartment. Socks from the homeowner's drawers were found around the upper level of the house and in the yard. Some of the socks in the yard contained pieces of jewelry. The police also found a sock in the yard that did not belong to either the homeowner or Koelbl. The police ascertained that the homeowner

had over $7,000 in jewelry taken from her house. This jewelry was never found. Koelbl had approximately $75 in mostly one-dollar bills and a cellular phone taken from his apartment. Koelbl's VCR was unplugged and left sitting on a chair outside his apartment.

After an extensive manhunt, King and Weatherspoon were arrested several hours later while hiding in some brush near Highway 36. King voluntarily surrendered to the police, but Weatherspoon resisted arrest. King was taken to the Washington County Jail and booked. All of the items found on King during both a search incident to arrest and a search at the jail were later determined to be his own. After receiving King's consent, the police searched King's car and found only King's property. During the search incident to Weatherspoon's arrest, the police recovered 54 one-dollar bills.

During the booking process, King inquired about his car. Washington County Sheriff's Deputy James Gribble, who was processing King, acted as though he did not understand King's questions. Gribble testified that King then explained the situation to Gribble in a way that suggested King had been inside the house. Gribble could not remember the exact words used by King, but gave the following testimony: "After I told him [King] I didn't know what he was talking about, he stated something close to the effect of the guy's house we were in, he took my car." Gribble also testified that when he told King that his car had been impounded, King responded that he did not know why the police were holding his car because he did not go into the house.

Washington County Sheriff's Investigator Dean Tilley interviewed King twice regarding his role in the burglary, giving him *Miranda* warnings each time. King agreed to waive his right to remain silent and then talked to Tilley. In both interviews, King repeatedly stated that he had not been inside the house and that the reason he was at the house was because

Weatherspoon, who is King's uncle, had asked him for a ride to the house of someone Weatherspoon claimed to know.

King gave the following version of events to Tilley. King stated that Weatherspoon paged him and offered to pay for gas if King would give him a ride to someone's house. Weatherspoon told King that he was going to the house because the person who lived there owed Weatherspoon money and was going to pay him back. Following Weatherspoon's directions, King drove his car to the house in Grant. When they arrived, Weatherspoon got out of the car and knocked on the front door, while King stayed with the car. After receiving no answer, Weatherspoon began walking around the house. King initially claimed that Weatherspoon came out the front door, but then King stated he was not sure exactly what Weatherspoon did because after waiting for Weatherspoon for a few minutes, King decided to look for him around the back of the house. It was only when he returned to the front yard that he noticed the front door was open and his car was missing.

During the second interview, Tilley attempted to catch King in a lie by asking King whether he walked around the pool in the backyard, even though there was no pool. In five different responses to Tilley's questions about the pool, King stated that he did not remember seeing a pool or that he did not notice a pool. King did admit that he had not walked all the way around the house as he had initially stated, but that he had only walked around the back of the house and then turned around and returned to the front of the house. King also gave a description of the backyard to Tilley that is consistent with the state's exhibit on the layout of the lot.

King stated that he first thought Weatherspoon had left with his car, but then he spotted Koelbl in the car at the end of the driveway. King said he motioned to Koelbl because he wanted to explain that he was not involved in what was going on at the house. King next ran toward Koelbl, holding his pager so he would not lose it. King stated that Koelbl started to drive toward him at full speed and then he became scared, so he ran away.

Both King and Weatherspoon were charged with two counts of aiding and abetting first-degree burglary in violation of Minn.Stat. §§ 609.582 (2000) and 609.05 (2000). The burglary statute requires that either the accused enter a building without consent and intend to commit a crime or enter without consent and actually commit a crime. Minn.Stat. § 609.582, subd. 1(a) (2000). King and Weatherspoon were both charged under the accomplice statute, which provides that an accomplice is liable for the principal crime if the accomplice intentionally assists in some manner. Minn.Stat. § 609.05(a) (2000). The counts against King and Weatherspoon were under alternate charging theories, the first based on entering the house with the intent to commit a crime and the second based on entering and actually taking something from the house.

Weatherspoon pleaded guilty to one count as part of a plea agreement. Weatherspoon requested that as part of his plea agreement he be released pending sentencing so he could make arrangements for the care of his sick wife. In exchange for his plea and plea testimony, the state recommended that Weatherspoon receive a 37–month sentence and that Weatherspoon be released pending his sentencing. On September 16, 1998, Weatherspoon entered a guilty plea and testified to his participation in the burglary. Per his plea agreement, he was released pending sentencing, which was scheduled for November 13, 1998.

King pleaded not guilty and requested a jury trial. King's trial took place on November 2–4, 1998, after two postponements for reasons unrelated to this appeal. Before trial, the state made three unsuccessful attempts to subpoena Weatherspoon to appear at King's trial. The state attempted to serve Weatherspoon once for

each trial date. On the second attempt, the officer attempting to serve Weatherspoon spoke to Weatherspoon's mother who indicated that he had moved, but did not provide the police with any further information. On November 3, 1998, the state contacted the court services worker who was performing Weatherspoon's pre-sentence investigation. The worker made one attempt to contact Weatherspoon by phone and was unable to do so. On that same day, the state requested that Weatherspoon be declared unavailable and that it be allowed to read his plea testimony to the jury. Over King's objection, the court found that Weatherspoon was unavailable as a matter of law and instructed the attorneys to work together to develop a redacted version of Weatherspoon's plea testimony that could be read to the jury.

On the last day of the trial, the district court ruled that Weatherspoon's redacted plea testimony was admissible in King's trial under Minn. R. Evid. 804(b)(3) be-cause it was given under oath and was against Weatherspoon's penal interest. Weatherspoon's redacted plea testimony was then read to the jury. Before the presentation, the court instructed the jury on Weatherspoon's unavailability and informed the jury of Weatherspoon's prior offenses. Additionally, the court ruled that King's attorney could elaborate in her closing argument on the difference between testimony given at trial and the plea testimony.

In his plea testimony, Weatherspoon stated that King was with him at the time of the burglary and that he and King had gone to the house with the intent to break-in. Specifically, Weatherspoon indicated that he and King had planned that King would kick in the door. However, Weatherspoon did not indicate who actually kicked in the door, only that it was kicked in and that he and King entered the house.[1] The state also introduced past-

1. Below is the text of Weatherspoon's redacted plea testimony as read to the jury.

Q: Mr. Weatherspoon, on July 15, 1998, is it true you were in the City of Grant in Washington County?
A: I believe that's was, yes.
Q: You were with another fellow named Arron King, is that right?
A: Yes.
Q: The two of you came to Grant Township from St. Paul, is that right?
A: Yes.
Q: And when you got to the City of Grant you went north on Manning Avenue and ended up at a residence located at 9850[sic] 65th Street, is that right?
A: Yes.
Q: When you arrived at the residence with Mr. King, the two of you got out of the car, is that right?
A: Yes.
Q: Did he get out first? You got out first?
A: I got out first, he got out second.
Q: Okay. And you went up to the door, knocked on the door and eventually broke the door down, is that correct?
A: Yes.
Q: And as it turned out, there was somebody home in this residence at the time, right?
A: As it turned out, yes.
Q: And your intent when you knocked down the door of this residence was to go in and take something, is that right?

A: Yes.
Prosecutor: Now, investigator, moving to page 11.
Q: And was there some discussion as to the fact that you were going to go in and take something from this residence?
A: Well, yeah. Yeah.
Q: What was that discussion?
A: Well, we didn't talk about going in the house, but we did say he was going to kick down the door. We did it, went in.
Q: Your intent in going into that residence was to take an item or items that were in there, is that correct?
A: Yes. We went in there, yes, we were going to take something.
Q: And in fact you did come out of that residence with various items?
A: Yes.
Q: And that included some cash, some jewelry, things like that?
A: Yes.
Q: And you had no one's consent to enter the residence, is that right?
A: No, we didn't have it.
Q: At what point did you become aware somebody was in this residence?
A: When I came out and there was a guy driving backwards in the car down the driveway, that's when I knew somebody had to have been—he had to come from the house. I didn't know he was there before-hand or nothing like that.

crime *Spreigl* evidence that 3 years earlier King had committed an attempted burglary in Hennepin County. The state introduced the evidence to show a similar modus operandi of King because in the 1995 burglary, to which King pleaded guilty, King and an accomplice attempted to take jewelry and a VCR from a house during the break-in and covered their hands with socks. The jury then found King guilty on both counts of aiding and abetting first-degree burglary and the court sentenced King on one count to serve 57 months in prison.

On appeal to the court of appeals, King argued that the district court erred in admitting Weatherspoon's plea testimony and therefore he is entitled to a new trial. King claimed that the district court erred in finding Weatherspoon unavailable because the state did not make a good-faith effort to locate Weatherspoon. King also argued that it was improper to admit Weatherspoon's testimony because it was not a statement against Weatherspoon's interest. King further maintained that even if the court of appeals were to conclude that admission of the testimony was proper under Minn. R. Evid. 804(b)(3), admitting Weatherspoon's testimony violated King's Sixth Amendment Confrontation Clause rights. King claimed the error could not be harmless beyond a reasonable doubt because Weatherspoon's testimony was the only direct evidence to show that King was a participant in a burglary. Finally, King argued that if it was proper to allow Weatherspoon's testimony, the district court should have included in its instructions a statement about the reason for Weatherspoon's unavailability. A divided panel of the court of appeals affirmed King's conviction in an unpublished opinion.

I.

■ On appeal to our court, King raises the same issues he raised before the court

Q: And again, all this occurred in Washington County in the City of Grant, is that right?

of appeals. He argues that the admission of Weatherspoon's plea testimony was improper under both the Minnesota Rules of Evidence and the Sixth Amendment Confrontation Clause of the United States Constitution. In order for Weatherspoon's plea testimony to be admissible under the rules of evidence, the district court must find that Weatherspoon was unavailable and the statement, when made, was against Weatherspoon's interest. Minn. R. Evid. 804(b)(3). In order for the plea testimony to be admissible under the Confrontation Clause, the district court must find that Weatherspoon was unavailable and that the statement is reliable. *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Here, because we conclude King's constitutional claim is dispositive, we will proceed directly to our analysis of that claim.

■ The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." U.S. Const. amend. VI. Even though a Confrontation Clause analysis is one involving questions of both fact and law, our review must be conducted independently of the lower courts' analyses to guarantee that the protections in the Confrontation Clause are satisfied. *Lilly v. Virginia,* 527 U.S. 116, 136, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). Therefore, appellate courts must review de novo the issue of whether admitted testimony violates a defendant's Confrontation Clause rights. *Lilly,* 527 U.S. at 136, 119 S.Ct. 1887; *State v. Leroy,* 604 N.W.2d 75, 77 (Minn. 1999).

■ A literal reading of the Sixth Amendment would bar all use of hearsay statements against a criminal defendant, but the amendment does not actually do so. *Idaho v. Wright,* 497 U.S. 805, 813,

A: Yes.

110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (holding that hearsay statements of an unavailable declarant that bear adequate indicia of reliability do not violate the Sixth Amendment). A court must follow a two-step inquiry to determine whether a hearsay statement may be admitted without violating a criminal defendant's Sixth Amendment rights. *Roberts*, 448 U.S. at 65, 100 S.Ct. 2531. The state must first establish the necessity of the hearsay statement by showing the unavailability of the declarant. *Id.* If unavailability is proved, then the state must prove that the statement bears adequate "indicia of reliability" for it to be admissible. *Id.* at 66, 100 S.Ct. 2531.

 We have not previously addressed what must be proved for a witness to be unavailable for purposes of the Confrontation Clause, but the United States Supreme Court did address this issue in *Roberts*, 448 U.S. at 65–78, 100 S.Ct. 2531. In *Roberts*, the Court held that the state bears the burden of establishing that a witness is unavailable and that, therefore, the hearsay testimony is necessary. *Roberts*, 448 U.S. at 65, 77, 100 S.Ct. 2531. To prove unavailability, the state must show that a good faith effort was made to procure the witness' presence. *Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). What efforts are required of a state in each situation is a question of reasonableness. *Roberts*, 448 U.S. at 74, 100 S.Ct. 2531. However, "[i]f there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." *Id.* (emphasis in original). In *Roberts*, the state made five attempts to subpoena a witness over a 5–month period. *Id.* at 59, 100 S.Ct. 2531. Additionally, the witness' mother was questioned in voir dire about her daughter's whereabouts. *Id.* The mother testified that she had no way of reaching her

daughter, even in an emergency. *Id.* On these facts, the Court concluded that the witness was unavailable. *Id.* at 60–61, 100 S.Ct. 2531.

In the case before us, the district court found Weatherspoon unavailable after the state made three unsuccessful attempts to serve a subpoena on him. King claims that it was error for the court to find that the state put forth a reasonable effort to locate Weatherspoon. King also argues that the nature of the error is compounded because of the state's responsibility for Weatherspoon's absence. King asserts that if the state had not facilitated Weatherspoon's release as part of his plea agreement, Weatherspoon would have been available to testify.

It is undisputed that the state made some effort to locate Weatherspoon, but the effort was not at the same level as the state's efforts in *Roberts*. The state did not attempt to contact Weatherspoon through his court services worker until after King's trial had begun, and then the worker only made one attempt to locate him by telephone. The state did not follow up with Weatherspoon's mother. Nor did the state attempt to contact Weatherspoon through his wife, even though it knew she lived in the area, had some contact with Weatherspoon, and that Weatherspoon had specifically sought his release to take care of her. Further, unlike the situation in *Roberts*, the state did not have any witness testify as to Weatherspoon's unavailability.

 The state did not take a number of the affirmative measures that had a reasonable possibility of locating Weatherspoon. Without ascribing a motive to the state, the cumulative effect of the state's actions is troublesome: (1) the state made certain that Weatherspoon's plea testimony contained incriminating statements about King,[2] (2) the state agreed to

---

2. We acknowledge that Weatherspoon was charged with aiding and abetting, a necessary element of which is that another person participated in the crime. However, Weatherspoon need not have identified King to es-

Weatherspoon's release, and (3) the state expended minimal efforts to find Weatherspoon for King's trial. Under these circumstances, a less than vigorous attempt to locate Weatherspoon is of questionable fairness to the defendant because it allows the state to avoid the inherent risks of putting a witness on the stand. Instead, the state can use testimony from a guilty plea setting, which is under the direct control of the prosecutor and requires disclosing only the basic elements of the offense necessary for the court to accept the plea. Despite our concern about Weatherspoon's unavailability, we only need to decide whether the state met its burden in showing that Weatherspoon was unavailable if we conclude that Weatherspoon's statement was reliable. *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. Therefore, we reserve deciding whether the state met its burden in establishing Weatherspoon's unavailability and first will determine if Weatherspoon's plea testimony had adequate indicia of reliability. We nonetheless caution the state that when the unavailability of a witness is at issue, we will look carefully for a good-faith effort to locate such a witness.

## II.

■ The Confrontation Clause requires the state to prove that a hearsay statement bears adequate indicia of reliability; otherwise, the statement is presumptively barred and cannot be admitted against a criminal defendant. *Wright*, 497 U.S. at 816, 110 S.Ct. 3139; *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. Statements that fall within a "firmly-rooted" hearsay exception are assumed to be reliable and are therefore admissible. *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. However, if the state seeks to admit a statement not within

a firmly-rooted hearsay exception, there must be "a showing of particularized guarantees of trustworthiness." *Id.* The guarantees of trustworthiness are gauged from the totality of the circumstances that existed when the statement was made. *Wright*, 497 U.S. at 819, 110 S.Ct. 3139. The Supreme Court has declined to provide a specific list of factors to consider when evaluating the totality of the circumstances, but the Court has held that the key inquiry is whether the statement is so reliable that cross-examination would have been of only "marginal utility." *Id.* at 820–22, 110 S.Ct. 3139. In the absence of such reliability, the Confrontation Clause bars the use of a hearsay statement against a criminal defendant. *Id.* "[U]nless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement." *Id.* at 821.

■ In 1999, a plurality of the Supreme Court concluded that the statement against interest exception to the hearsay rule, found in Fed.R.Evid. 804(b)(3), is not a "firmly-rooted" exception for purposes of Confrontation Clause analysis.[3] *Lilly*, 527 U.S. at 134, 119 S.Ct. 1887. When we have analyzed statements against interest under the Confrontation Clause in the past, we have either assumed that the statement against interest exception is a firmly-rooted exception or we have considered such statements reliable under the totality of the circumstances because of their self-inculpatory nature. *E.g., State v. Aubid*, 591 N.W.2d 472, 480 (Minn.1999); *State v. Dukes*, 544 N.W.2d 13, 19 (Minn. 1996). However, in *Lilly*, the Supreme Court stated that confessions by an accom-

tablish that he committed the crime with another.

**3.** There were four justices who concluded that the statement against interest exception was not a firmly-rooted hearsay exception and therefore reliability of such statements must

be proved. *Lilly*, 527 U.S. at 134, 119 S.Ct. 1887. In a concurrence, Justice Scalia stated that he believed the use of statements against interest is a "paradigmatic" Confrontation Clause violation. *Id.* at 143, 119 S.Ct. 1887 (Scalia, J. concurring).

plice that incriminate the criminal defendant are "inherently unreliable" even absent any express promises of leniency. 527 U.S. at 131, 139, 119 S.Ct. 1887. The Court further emphasized that due to their unreliability, accomplice statements that shift or spread blame must be subject to cross-examination. *Id.* at 132, 119 S.Ct. 1887 (explaining the holding in *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)). But the Court's holding in *Lilly* does not mean that statements against interest will automatically violate the Confrontation Clause. What it does mean is that the state must affirmatively prove the reliability of a statement against interest and cannot rest on the mere fact that it is a statement against interest. If the state fails to affirmatively prove reliability, the statement's use will violate the defendant's Confrontation Clause right to cross-examine a witness.

■ Weatherspoon's testimony was given under oath at his plea hearing, but he was not subject to cross-examination at that hearing. Weatherspoon did not receive a reduced sentence, although the state did agree to recommend a sentence at the bottom of the range recommended in the sentencing guidelines. Additionally, in return for his plea, Weatherspoon was released from custody pending sentencing. Weatherspoon's plea agreement was not contingent on his testimony against King, although his testimony was consistent with one of the statements he gave police during his custodial interrogation, when he arguably was seeking to curry favor with the investigators.

Here, in light of the holding in *Lilly* requiring an affirmative showing of reliability and the Supreme Court's distrust of co-conspirator statements against interest that shift or spread blame, only the oath given to Weatherspoon weighs in favor of his testimony being admissible. The benefits provided to Weatherspoon and the inherent unreliability of accomplice statements must be weighed against Weatherspoon's oath. We note that in the guilty plea the state used the term "you" without clarifying whether "you" meant Weatherspoon or Weatherspoon and his accomplice. As presented, the testimony comported with the charge of aiding and abetting, but cross-examination might have revealed that Weatherspoon acted alone in certain respects. We also recognize that despite the oath to tell the "whole truth," the full story is often not revealed in guilty plea testimony. Considering all factors, we conclude the state did not overcome the presumption against admissibility of Weatherspoon's plea testimony and did not prove that cross-examination of Weatherspoon would be of only marginal utility. We hold that the admission of Weatherspoon's plea testimony violated King's Sixth Amendment Confrontation Clause rights and therefore the district court erred in admitting the testimony.

### III.

■ Our decision that the admission of Weatherspoon's plea testimony violated King's Confrontation Clause rights does not end our inquiry. A defendant is not automatically entitled to a new trial when his constitutional rights are violated. *Chapman v. California*, 386 U.S. 18, 21, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Juarez*, 572 N.W.2d 286, 291 (Minn.1997). A conviction can stand only if the error committed was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24, 87 S.Ct. 824; *Juarez*, 572 N.W.2d at 291. In *Juarez*, we explained that the harmless error analysis is actually a harmless error impact analysis and the inquiry is not "whether a jury would have convicted the defendant without the error, rather * * * whether the error reasonably could have [had an impact on] * * * the jury's decision." *Id.* at 292. As further explanation, we held that if the verdict is "surely unattributable" to the error, then the error is harmless beyond a reasonable doubt. *State v. Keeton*, 589 N.W.2d 85, 91 (Minn. 1998); *State v. Greenleaf*, 591 N.W.2d 488,

503, *cert. denied, Greenleaf v. Minnesota,* 528 U.S. 863, 120 S.Ct. 156, 145 L.Ed.2d 132 (1999).

▇▇ Part of Weatherspoon's plea testimony is corroborated by other direct testimony. Koelbl identified King as one of two men present on the day of the burglary and King admitted that he was at the house. However, the key criminal elements in dispute are the same elements that the state used Weatherspoon's testimony to prove. Both of King's convictions rest on the assumption that King assisted Weatherspoon in some manner with at least the intent of committing a crime. To prove King's assistance under either theory, the state needed to prove that King drove Weatherspoon to the house knowing that Weatherspoon intended to illegally enter the house and take something, that King entered the house and intended to take something, or that King actually took something. The only direct evidence that shows King's intent to assist with a burglary or his actual participation in the burglary is the plea testimony of Weatherspoon.[4]

The only testimony providing any corroboration for the critical parts of Weatherspoon's plea testimony is the testimony of Deputy Gribble. Gribble admitted that he could not remember King's exact words. But Gribble testified that King told him "*something close to the effect of the guy's house we were in, he took my car.*" This testimony is important to the state because it places King "in" the house as opposed to "at" the house, as King has claimed. This is a critical distinction. In essence, the state rests a critical aspect of its case on a distinction between "in" and "at" without any assurance that the term "in" was ever used. The difficulty in relying on Gribble's testimony is further complicated by the fact that Gribble also testified that King went on to state directly that he had not been in the house.

The other piece of evidence that the jury could have considered was the fact that King had attempted to burglarize a house 3 years earlier, and in that attempt he and his accomplice attempted to take jewelry and a VCR and covered their hands to avoid leaving fingerprints. Past-crime evidence cannot be used to show conduct in conformity with character, but it can be used to show a modus operandi. Minn. R. Evid. 404(b)(3). Here, the state offered, and the court approved, the use of the past-crime evidence to show modus operandi. The state explained that the purpose it sought to use the evidence, and upon which the court found its use acceptable, was to show entry into the house without consent.[5] Therefore, in this case, the jury could properly consider King's prior conviction only to establish that in the past he had attempted to take valuable things from a home—VCR and jewelry— and covered his hands-with the socks—to avoid leaving fingerprints. This type of identification information, while relevant, is hardly unique to King and it is not the unique method of burglary characterized by the dissent. If the jury were only considering the evidence for its proper purpose, it is not as strong as the direct evidence provided in the Weatherspoon plea testimony.[6]

---

**4.** Contrary to the dissent's assertion, King's statements during interrogation did not contain "several inconsistencies," but rather his statements were consistent on the pertinent points of the interrogation despite persistent questioning by Investigator Tilley. This consistency is all the more remarkable because King's answers were often interrupted with further questions which resulted in confusion as to which question was being answered and the questioning consisted of numerous untrue statements and misleading questions which appear to have been intended to trick or trap King into making damaging admissions. A thorough review of King's interviews with Investigator Tilley indicates that these interviews do not support the dissent's harmless error argument.

**5.** The state explained, "[t]he element on which this evidence would be offered would be entry without consent. The question here, of course, is did he go into the house."

**6.** The dissent characterizes the past-crime evidence as the type on which the jury relied, instead of relying on the more direct Weather-

In completing a "harmless error impact" analysis, we do not consider whether the jury could have convicted King absent Weatherspoon's testimony. Rather, it is necessary to determine what effect Weatherspoon's testimony had on the jury's verdict and more specifically, whether the jury's verdict is "surely unattributable" to the testimony. *Juarez*, 572 N.W.2d at 292. To convict King, the jury must have found that King intended to assist Weatherspoon in the burglary. When we look to the evidence used to establish King's intent, the jury could consider the equivocal testimony of Gribble, the circumstantial evidence of King's activities while at the house, evidence of King's prior conviction, and the direct statements contained in Weatherspoon's plea testimony. Of the available evidence, the strongest and clearest evidence of King's involvement is Weatherspoon's incriminating plea testimony. Hence, we believe that it is counterintuitive to suggest that the jury would ignore the strongest and clearest evidence before it, Weatherspoon's plea testimony, and instead rely on weaker, equivocal evidence. Therefore, upon review of the entire record, we conclude that Weatherspoon's plea testimony reasonably could have had an impact on the verdict. As a result, we cannot say that the jury's verdict was surely unattributable to the error. Accordingly, we hold that the district court's error in admitting Weatherspoon's plea testimony was not harmless error and therefore King is entitled to a new trial.

Reversed and remanded for further proceedings consistent with this opinion.

LANCASTER, Justice (dissenting).

I concur in Parts I and II of the opinion, but respectfully dissent as to Part III. Numerous pieces of evidence support the jury's conviction, only one of which was Weatherspoon's plea statement. I therefore conclude that the district court's decision to admit the statement was harmless beyond a reasonable doubt.

When reviewing an error to determine whether it is harmless beyond a reasonable doubt, we must conduct a thorough examination of the record as a whole in order to determine if the verdict was unattributable to the error. *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997); *State v. VanWagner*, 504 N.W.2d 746, 749 (Minn. 1993) ("The error and its impact are to be examined within the context of the record as a whole, considering the strength of the state's evidence and the weaknesses of any defense evidence."). The court may not view each incident in isolation when deciding if an error is harmless. *State v. Dillon*, 532 N.W.2d 558, 558 (Minn.1995) ("The reviewing court * * * must read the entire record * * *."). Whether an error is harmless depends on factors such as the importance of the testimony or statement, the presence or absence of corroborating or contradicting evidence, and the overall strength of the prosecution's case. *State v. Wildenberg*, 573 N.W.2d 692, 702 (Minn. 1998); *Dillon*, 532 N.W.2d at 558 ("As a general rule, the stronger the evidence of guilt, the less likely that any error is prejudicial.").

King admitted that he used his car to drive Weatherspoon to the house in Grant. He acknowledged being at the house dur-

spoon plea testimony. However, we have concerns about affirming a conviction based on earlier conviction. Evidence of prior convictions may be permissibly used only in limited circumstances. "While the jurors in this case were entitled to consider this evidence in determining whether [the defendant] in fact committed the acts alleged, they were not entitled to convict him based on their assessment of him as a person or based on what he has done in the past." *United States v. Bahe*, 40 F.Supp.2d 1302, 1312 (D.N.M.1998). In

much the same way, we should not affirm a conviction that was obtained through the use of constitutionally prohibited testimony simply because King committed a crime using a similar, albeit common, method 3 years earlier. Further, we have concerns about expanding the use of the past-crime evidence beyond the purpose for which it was offered and accepted at trial in order that we can justify affirming a conviction under a harmless error analysis.

ing the burglary, and an eyewitness confirmed his presence there. During the booking process, King described the robbery to Deputy Gribble in such a way as to imply that he, King, had been inside the house. Further, King's interviews with Investigator Tilley contain inconsistencies relating to what he did and saw during the robbery. During his second interview, King admitted that he did not tell the full truth at his initial interview and conceded that he told a "bogus" story.[7] The jury also heard evidence that King fled the scene after being discovered by Koelbl and that King evaded capture for several hours during a wide-spread manhunt involving local police officers, police dogs, the state patrol, and a state patrol helicopter.

The state also introduced evidence of King's 1996 attempted second-degree burglary conviction to demonstrate modus operandi. Minn. R. Evid. 404(b) ("Evidence of another crime, wrong, or act is not admissible to prove * * * character * * * [but it] may * * * be admissible [to prove] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."). The majority acknowledges that intent was an issue in the case, but asserts that the other-crimes evidence here could not be used to show intent: "[T]he jury could properly consider King's prior conviction *only to establish* that in the past he had attempted to take valuable things from a home * * *." *Supra* at 810 (emphasis added). However, upon introduction of the evidence the district court instructed:

> THE COURT: At this time the state intends to introduce evidence of an occurrence on September 14th, 1995 at Hennepin County. This evidence is being offered for the limited purpose of assisting in determining whether defendant committed those acts with which

defendant is charged in the complaint I have read to you.

The majority dismisses the remarkable similarities between the present case and King's prior conviction. Specifically, in the 1996 burglary King and an accomplice broke into and ransacked a residence. During the burglary, jewelry boxes were overturned and emptied, drawers were open and disturbed, and a VCR was sitting on a chair, apparently ready to be taken. At the scene, police found several socks strewn about, found socks near a fence that King had jumped, and found a pair of socks close to where King was ultimately apprehended. The facts surrounding King's 1996 burglary conviction are essentially identical to the case at hand. In the current case, the house was broken into and ransacked, the contents of drawers, closets, and jewelry boxes were in disarray, jewelry was stolen, a VCR sat outside the home, socks were strewn about the scene, and some of the socks contained pieces of jewelry.

The combined effect of all of this evidence points unerringly to King's guilt. Despite the majority's concern that Weatherspoon's testimony was the only direct evidence placing King in the house, circumstantial evidence can be sufficient to support a conviction. *E.g., State v. Whittaker,* 568 N.W.2d 440, 452 (Minn.1997). Moreover, the crime for which King was convicted, aiding and abetting burglary, does not require that King entered the house. Minn.Stat. § 609.05, subd. 1 (2000) ("A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime."). Further, any possible prejudice resulting from the introduction of Weatherspoon's statement was minimized because the jury was aware of Weatherspoon's conviction for aiding

---

**7.** King gave false information about what he did during the burglary, first explaining that he made a full circle of the house to look for Weatherspoon. Then when Investigator Tilley questioned King about the layout of the

back yard, King confessed that he failed to tell the full truth and that he in fact never circled the house but instead looked for Weatherspoon from the corner of the yard.

and abetting burglary, and King used the conviction to impeach the plea statement. During the jury charge, the judge also reminded the jury that it should consider Weatherspoon's conviction when deciding the weight to give to the statement.

In summary, given the strength of the state's evidence against King and the minimal impact that Weatherspoon's statement could have had on the jury, the verdict was surely unattributable to the admission of the plea statement. Therefore, I would hold that the admission of the statement was harmless error and King is not entitled to a new trial.

STRINGER, Justice (dissenting)

I join in the dissent of Justice Joan Ericksen Lancaster.