**STATE of Minnesota, Respondent,**

v.

**Alexander JUAREZ, petitioner, Appellant.**

**No. C2–96–404.**

Supreme Court of Minnesota.

Dec. 18, 1997.

---

Steven P. Russett, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty. by Linda K. Jenny, Asst. County Atty., Minneapolis, for respondent.

## OPINION

TOMLJANOVICH, Justice.

On November 9, 1995, appellant Alexander Juarez was convicted of attempted criminal sexual conduct, third-degree criminal sexual conduct, and two counts of soliciting a minor to engage in prostitution, in violation of Minn.Stat. §§ 609.17, 609.324, subds. 1(b)(2), 1(c)(2), 609.342, subd. 1(a), and 609.344, subd. 1(e)(1996). At a pretrial hearing, Juarez moved that a portion of his taped statement to the police be suppressed, specifically all statements made after Juarez said "I'm gonna have to get a lawyer next." The district court did suppress the portion of the statement following Juarez' reference to an attorney, but ruled that the statement itself was not an invocation of Juarez' right to counsel and allowed it to be introduced at trial. The court of appeals concluded that although the admission of this statement was error, the error was harmless and affirmed the conviction. Juarez now petitions this court for further review.

Until March of 1995, appellant Alexander Juarez, born April 18, 1936, was employed as a maintenance painter at St. Joseph's Home for Children, a mental health facility for emotionally disturbed children. Juarez held this position for approximately five years. St. Joseph's offered a program called Operation Success to children at the residential facility who met certain criteria, allowing these children to work with St. Joseph's staff both on site and occasionally off site. Through this program, Juarez had interaction with several residents of St. Joseph's, including 16–year–old C.C. and 15–year–old A.F. Through his maintenance position at St. Joseph's, Juarez also had some contact with 17–year–old resident J.M., although J.M. never worked for Juarez.

On March 24, 1995, during a group meeting at St. Joseph's, there was a discussion about the presence and distribution of cigarettes and marijuana in the facility. C.C. was accused by several residents of distributing the cigarettes and marijuana. Accusations were then leveled against Juarez by both C.C. and J.M. that Juarez had supplied the cigarettes and marijuana. After the meeting, C.C. and J.M. met with staff counselor Raven Mason. J.M. told Mason that Juarez was having sex with C.C. Initially C.C. said nothing, but after J.M. left, C.C eventually told Mason that he and Juarez had sex at Juarez' house and that Juarez had given C.C. over $300. The police were immediately notified and Juarez was suspended with pay pending the investigation.

On March 27, 1995, C.C. underwent a sexual assault examination. The examination revealed no physical evidence of a sexual assault.[1] On April 4, 1995, the investigating officer, Sergeant Martinson, spoke with C.C., who told Martinson that Juarez paid C.C. money to fondle C.C.'s buttocks and that on two occasions Juarez had anal intercourse with C.C. On one of those occasions, Juarez

was unable to maintain an erection. C.C. also told Martinson that Juarez told him that he had sex with two other residents of St. Joseph's, B.M. and L.N. On April 5, 1995, Martinson spoke with J.M., who accused Juarez of sexually propositioning him.[2] The next day, Martinson spoke with J.S, Juarez' 10–year–old foster child. J.S. told Martinson that Juarez had fondled his buttocks and had digitally penetrated his anus, but J.S. refused and it was not pursued any further. J.S. also told Martinson that Juarez had once asked him if he could insert his "dingleberry" into his anus. J.S. further said that on several occasions Juarez would threaten to put him in a "cuckoo house" if he told anybody what was going on.

As a result of this investigation, Juarez was arrested and interrogated. At one point during this interrogation, Juarez stated "I'm gonna have to get a lawyer next." At that point, Martinson left the room for several minutes. When Martinson returned, he told Juarez that he believed Juarez would be convicted. Juarez responded, "Well, I'm gonna have to get a lawyer on that." Martinson then asked if Juarez wanted to talk to him, to which Juarez responded, "No, I think I better get a lawyer." Juarez' taped statement up to and including "I'm gonna have to get a lawyer next," was played at trial during Martinson's testimony.

At trial, the jury heard testimony from J.S., C.C., J.M., and A.F., accusing Juarez of criminal sexual conduct and solicitation. J.S. testified that Juarez had "touched [his] butt" on more than one occasion and that Juarez tried to touch his "booty-hole" with his finger. J.S. stated that on one occasion Juarez asked "if he could put his dick in my butt," but J.S. said no, and Juarez never tried to do so. J.S. testified to seeing Juarez and C.C. watching pornographic movies in Juarez' bedroom. J.S. further testified that he did not tell anyone about these things because

1. Dr. Marjorie Hogan, a physician trained in child sexual abuse, examined C.C. She testified at trial that although his exam was normal, it was nonetheless consistent with C.C.'s report of sexual abuse, because "even with two to three days there is significant, if not complete healing of the small traumas. As I mentioned earlier, however, there often is not even an initial injury because

that area of the body is so elastic and distensible."

2. A.F., a former St. Joseph's resident who had worked with Juarez, also accused Juarez of sexually propositioning him, however Martinson did not interview A.F. until October 6, 1995, after Juarez was arrested.

Juarez often told J.S. that he would be sent to the "cuckoo house."

C.C. testified that before he started working for Juarez, Juarez had grabbed his butt a couple times, but C.C. told him he was uncomfortable with that and Juarez stopped. C.C. then got permission to work off grounds with Juarez "between four and five and a dozen" times, but usually ended up at Juarez' house instead of working. C.C. testified that he watched pornographic movies with Juarez in his bedroom on more than one occasion. C.C. testified that on one occasion Juarez digitally penetrated his anus. When C.C. told him to "knock it off," Juarez stopped, and gave C.C. ten to twenty dollars.

C.C. further testified that Juarez had given him alcohol occasionally, and one time when C.C. "wasn't in the right state of mind," Juarez attempted to have anal sex with C.C. However, Juarez was unable to maintain an erection. C.C. testified that afterwards he asked Juarez for some money, and Juarez gave him $40. The last time C.C. was at Juarez' house, C.C. testified that someone spiked his Coke with whiskey, and Juarez had anal sex with him when C.C. was "just drunk out of [his] mind." C.C. further testified that Juarez had a .32 caliber handgun, and that the gun was sitting on a counter about four feet away from the bed. Juarez did not overtly threaten him with the gun, but C.C. testified that the gun scared him.[3]

J.M. testified that both C.C. and Juarez told him that Juarez had anal sex with C.C. J.M. also testified that Juarez would make sexual innuendos to him and once mentioned that he had a 12-inch penis. J.M. stated that on one occasion when Juarez was talking about having sex with J.M. in the future, he showed J.M. some money.

A.F. testified that when he was a resident at St. Joseph's he worked for Juarez off-grounds remodeling a condominium. A.F. testified that on one occasion, Juarez asked him "how much it would cost for me to turn around and bend over," which A.F. interpreted as a sexual reference. A.F. testified that on another occasion Juarez asked him "how much for a blow job" and whether A.F. knew any "gay" kids on his unit at St. Joseph's. A.F. testified that after this incident he stopped working for Juarez, but he did not report any of these incidents because he did not think anyone would believe him. A.F. further testified that he saw Juarez grab 14-year-old L.R.'s buttocks. L.R. and A.F. were roommates at St. Joseph's at the time. After this incident, A.F. saw L.R. with approximately $500, which L.R. said he got from his "uncle," meaning Juarez. A.F. testified that he did not know C.C., J.M., or J.S.

Testifying in his own defense, Juarez said that he never inappropriately touched his foster son, J.S. He also testified that he never threatened to send J.S. to the "cuckoo house," but that once after J.S. had misbehaved at school he asked him why he was acting like a "Loony Tune." Juarez claimed he had permission to bring C.C. off-grounds to repair a sidewalk, but that it was too cold, so instead he brought C.C. to his house to do some work. Juarez testified that he had never had sex with C.C. Juarez also denied he gave C.C alcohol or drugs. Juarez admitted he owned a gun, but he claimed he always kept it unloaded. Juarez denied propositioning either J.M. or A.F. for sex. Juarez also testified that A.F. stopped working for him because Juarez fired him for deliberately plastering over an outlet while he was working at the condominium.

Daniel Fisher testified for the defense. Fisher lived with Juarez from July 1, 1994 to March 1, 1995, which was during the period of time that Juarez' foster son J.S. was living at the house. Fisher said that he was home much of the time and that he never saw Juarez behave inappropriately with J.S., nor did he ever see any pornography at the house.

Several St. Joseph residents testified for the defense as well: B.M., R.W., D.K., J.J.,

---

**3.** Juarez' home was searched on April 6, 1995. The police did not find marijuana, but they did find a TV, VCR, and a gun on the entertainment center in Juarez' sleeping area, where C.C. testified that they watched the pornographic movies. Bottles of alcohol were also found in a box in J.S.'s bedroom closet.

and L.N.[4] They all testified that Juarez never inappropriately touched them or propositioned them when they worked with him on jobs. B.M. also testified that he was at Juarez' house the day C.C. alleged his drink was spiked and Juarez had anal intercourse with him. B.M. claimed he did not see Juarez engage in any inappropriate behavior with C.C.

L.R. also testified for the defense. Refuting A.F.'s testimony, L.R. claimed Juarez never fondled his butt, nor did he ever show A.F. $500. L.R. further testified that A.F. was always trying to get him in trouble because A.F. wanted to date L.R's girlfriend. Finally, L.R. testified he never saw Juarez touch anyone in a sexual manner, nor did he ever hear Juarez make any sexual comments to anybody.

The jury ultimately acquitted Juarez of first-degree criminal sexual conduct against J.S., but convicted him of attempted first-degree criminal sexual conduct against J.S., third-degree criminal sexual conduct against C.C., and two counts of soliciting minors J.M. and A.F. for prostitution. Juarez was subsequently sentenced to prison for 122 months and ordered to pay $800 in fines, register as a sex offender, and provide a DNA sample.

On review, this court must determine whether the district court abused its discretion in allowing the jury to hear Juarez' reference to an attorney in his taped statement. A determination that the district court erred in admitting the statement will not result in an automatic reversal of the conviction if the error is "harmless beyond a reasonable doubt." *State v. Roberts,* 296 Minn. 347, 353, 208 N.W.2d 744, 747 (1973).

## I.

■ If at any time during interrogation, an accused invokes the right to remain silent or requests counsel, all custodial interrogation must cease. *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966). Furthermore, after an accused requests counsel, the police may not reapproach the accused and any statements subsequently obtained may not be introduced into evidence at trial. *Edwards v. Arizona,* 451 U.S. 477, 485–87, 101 S.Ct. 1880, 1885–86, 68 L.Ed.2d 378 (1981). Federal law requires the request for counsel to be clear and unequivocal. *Davis v. United States,* 512 U.S. 452, 458–62, 114 S.Ct. 2350, 2355–56, 129 L.Ed.2d 362 (1994). However, this court has adopted the rule that an equivocal or ambiguous statement subject to a construction that the accused is requesting counsel requires questioning to cease, except for narrow questions designed to clarify the accused's true desires. *State v. Robinson,* 427 N.W.2d 217, 223 (Minn.1988).[5]

In the present case, Juarez' statement arguably is subject to construction that he was requesting counsel. But whether or not Juarez' statement, "I'm gonna have to get a lawyer next," was, in fact, an invocation of his right to counsel is not really at issue in this case. The issue presented here is whether allowing the jury to hear the statement itself constituted error.

■ A defendant's choice to exercise his constitutional right to counsel may not be used against him at trial. *Miranda,* 384 U.S. at 468 n. 37, 86 S.Ct. at 1624 n. 37; *Roberts,* 296 Minn. at 352, 208 N.W.2d at 747. In *Roberts,* the defendant initially agreed to speak with the police, but later stated he wanted to speak with his attorney. The district court allowed his statement that he wanted to speak with his attorney to be introduced at trial. This court concluded that admitting the statement was error, be-

---

4. B.M. and L.N. were the individuals that C.C. testified Juarez claimed to have sex with.

5. This court has noted that generally the police and the courts must examine the language used by the defendant in determining whether the defendant has attempted to invoke right to counsel. *State v. Williams,* 535 N.W.2d 277, 283 (Minn.1995). A defendant's question, "Shouldn't I have an attorney so you don't ask me any illegal questions," while an ambiguous request for counsel, was sufficient to require the officers to cease the interrogation or clarify the defendant's desires. *State v. Doughty,* 472 N.W.2d 299, 303 (Minn.1991). *Cf. State v. Hale,* 453 N.W.2d 704, 708 (Minn.1990) (Defendant's "fleeting, off-hand comment" about a future need for a good attorney was not enough to require the officers to either cease the interrogation or clarify the defendant's desires).

cause the jury could view his request as a "badge of guilt." *Roberts*, 296 Minn. at 353, 208 N.W.2d at 747.

The court of appeals correctly concluded that: "It is not the legal effect of Juarez's ambiguous statement that is at issue, rather it is its prejudicial effect on the jury. From all the jury was allowed to hear, Juarez did invoke his right to counsel." *State v. Juarez*, No. C2–96–404, slip op. at 4, 1996 WL 706832 (Minn.Ct.App. Dec. 10, 1996) (unpublished). The court of appeals noted that hearing Juarez mention his need for counsel left them "likely to infer * * * that the defendant was concealing his guilt." *Id.* at 5 (quoting *Roberts*, 296 Minn. at 353, 208 N.W.2d at 747). We agree. A jury hearing this statement would probably conclude that Juarez was requesting an attorney. Thus it was error for the statement to be played for the jury.

## II.

A determination that the district court erred in admitting Juarez' statement does not automatically result in a reversal of his conviction and the granting of a new trial. The conviction may stand so long as the admission of the statement was harmless beyond a reasonable doubt. *Roberts*, 296 Minn. at 353, 208 N.W.2d at 747; *State v. Jones*, 556 N.W.2d 903, 910 (Minn.1996). We take this opportunity to clarify the standard for harmless error in Minnesota.

In analyzing harmless error impact, the court of appeals relied on this court's recent opinion in *State v. Townsend*, 546 N.W.2d 292, 297 (Minn.1996). The court of appeals concluded that "harmless beyond a reasonable doubt" means that the "weight of the evidence must be such that it justifies the verdict regardless of the erroneous admission." *Juarez*, slip op. at 5. In other words, the weight of the evidence must be "so overwhelming as to lead a reasonable jury to arrive at the verdict even without the prejudicial evidence." *Id.* The court of appeals examined all the evidence and concluded that Juarez' conviction was supported by evidence, and thus the error was harmless beyond a reasonable doubt. *Id.* Its conclusion, while accurate, does not by itself establish that the erroneous admission was harmless; that the evidence was sufficient, or even overwhelming, does not mean that the error was necessarily harmless. Harmless error analysis is better labelled as "harmless error impact analysis," because it is the impact of that error that the appellate court must consider. The overwhelming evidence of guilt is a factor, often a very important one, in determining whether, beyond a reasonable doubt, the error has no impact on the verdict.[6]

Both this court and the United States Supreme Court have stated that before error is deemed harmless, it must be harmless beyond a reasonable doubt. *Roberts*, 296 Minn. at 353, 208 N.W.2d at 747; *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The United States Supreme Court has further stated that when analyzing harmless error impact, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman*, 386 U.S. at 23, 87 S.Ct. at 827 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). When analyzing whether the error was harmless beyond a reasonable doubt, the *Chapman* Court noted that reasonably strong circumstantial evidence was presented against the defendants, but concluded nonetheless that "absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts." *Id.* at 25–26, 87 S.Ct. at 829.

More recently, the United States Supreme Court addressed harmless error impact in *Sullivan v. Louisiana*, 508 U.S. 275, 278–82, 113 S.Ct. 2078, 2081–83, 124 L.Ed.2d 182 (1993):

> [T]he question [*Chapman*] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable

---

**6.** We concede that on occasion we have inadvertently misstated the significance of the strength of the evidence of guilt in harmless error analysis. An example is our decision in *Townsend*, on which the court of appeals relied. 546 N.W.2d at 292. To the extent that decision, or any other decision of this court or the court of appeals, misstates the significance of the strength of the evidence in harmless error analysis, the decision should not be followed.

jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which the jury *actually rested* its verdict. The inquiry, in other words is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.

*Id.* at 279, 113 S.Ct. at 2081 (emphasis in original)(internal quotes and citations omitted).

Although this court's decision in *Roberts* was decided before *Sullivan,* this court's harmless error analysis in *Roberts* is entirely consistent with the standard articulated by the United States Supreme Court. In *Roberts,* the defendant's request for counsel was introduced into evidence. This court stated that based upon the evidence in the case, the jury could reasonably have found the defendant to be guilty. This court, nonetheless, found prejudicial error:

> [A]n important factor in the jury's determination was whether they believed defendant or the victim, Clark. There are substantial conflicts in the testimony of both defendant and Clark. No eyewitness testified. The testimony that defendant requested counsel rather than answering whether he committed the crime could reasonably have influenced the jury's decision. Therefore, we hold that the error was sufficiently prejudicial to require that defendant be granted a new trial.

*Roberts,* 296 Minn. at 353, 208 N.W.2d at 747–48. In rendering this decision, we did not analyze whether a jury would have convicted the defendant without the error, rather we looked to whether the error reasonably could have impacted upon the jury's decision.

■ Likewise, in *Jones,* this court analyzed whether an error violating the defendant's right to confront witnesses was harmless. 556 N.W.2d at 908–10. This court stated:

> When applying the *Chapman* harmless error test, appellate courts must look to the basis on which the jury rested its verdict and determine what effect the error had on the actual verdict. If the verdict actually

rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt.

*Id.* at 910 (citing *Sullivan,* 508 U.S. at 279, 113 S.Ct. at 2081). This is the correct standard that should be applied to the instant case. Following this standard, the question becomes: What effect did the jury's hearing Juarez' statement "I'm gonna have to get a lawyer next" actually have on the guilty verdict rendered? If the verdict rendered is "surely unattributable" to the error, then the error is harmless beyond a reasonable doubt and the conviction stands.

■ In our analysis, we look to the record as a whole. Although it is not sufficient to find that without the error enough evidence exists in support of the conviction, without a thorough examination of the evidence it would be impossible to discover whether the jury's verdict was "surely unattributable" to the erroneous admission.

First, with regard to J.S., his testimony, for the most part, is consistent with what he initially told Sergeant Martinson about the sexual contact. J.S. told Martinson that Juarez touched him on the buttocks and on his anus, facts to which J.S. testified to as well. J.S. told Martinson that on one occasion, Juarez asked J.S. if he "could put his dingleberry into his butt," but J.S. refused and Juarez did not do so. J.S. testified to this incident as well, saying that Juarez asked him "if he could put his dick in my butt," but that he refused and Juarez never did so. Another consistency between J.S.'s testimony and what he told Martinson is Juarez' threats of sending J.S. to the "cuckoo house" if he told anybody what Juarez did to him. The only inconsistency is that Martinson testified that J.S. said Juarez had digitally penetrated his anus, while J.S. testified that no penetration occurred. However, the jury acquitted Juarez of first-degree criminal sexual conduct and convicted him of attempted first-degree criminal sexual conduct, indicating that they dealt with the inconsistency by believing J.S.'s testimony at trial as to the events that had occurred.

C.C.'s testimony is consistent with what he originally told Martinson and Mason, the

staff counselor at St. Joseph's. Juarez himself testified he had an impotency problem during the same time period that C.C. testified Juarez attempted to have anal sex with him but could not complete the act. The night that C.C. testified Juarez spiked his drink and had anal sex with him, staff counselor Mason testified that when C.C. returned to St. Joseph's his demeanor indicated to Mason that there was "something going on."[7] In addition, C.C.'s testimony about the pornographic movies is consistent with J.S.'s testimony about seeing C.C. and Juarez watch pornographic movies in Juarez' bedroom. No pornographic movies or marijuana were found in the search, however, the officers did discover the gun described by C.C. and bottles of alcohol.

A.F. and J.M.'s testimony also is consistent with what they told Martinson. While the defense hinted at possible collusion between the witnesses, such a conspiracy is unlikely. The initial interviews of C.C., J.S., and J.M conducted by Martinson were each one day apart, hardly enough time for the three to plan consistent stories. In addition, A.F. testified that he did not know J.S., J.M., or C.C. C.C. testified he did not know A.F. J.M. testified he did not know J.S. or A.F. Finally, there was testimony from a director at St. Joseph's that A.F. left the facility before C.C. and J.M. became residents, further corroborating their claims they did not know one another.[8]

As Juarez' counsel points out in its appellate brief, an important factor in the jury's determination was the credibility of the witnesses: "[B]ecause there were no eyewitnesses or medical evidence corroborating any of the claimed instances of sexual misconduct, credibility was the determinative factor in this case. Thus, as in Roberts, there is more than a reasonable possibility that the erroneously admitted evidence attributed to the jury's resolution of the charges." How-

ever, the lack of any corroborating medical evidence, in light of Dr. Hogan's testimony, does not favor either Juarez or the state. In addition, although there are no eyewitnesses, considering the nature of the charges this is hardly surprising, and should not lessen the strength of the victims' testimony. Finally, the jury in this case heard testimony from four separate victims, the defendant, and eight defense witnesses who said that Juarez never behaved in a sexually inappropriate manner. Therefore, unlike Roberts, the credibility determination did not hinge solely on whether they believed either the defendant or the victim.

We conclude that although it was error to admit the statement, the error is harmless beyond a reasonable doubt. Accordingly, Juarez' request for a new trial is denied and his conviction is affirmed.

Affirmed.

BLATZ, J., took no part in the consideration or decision of this case.

---

7. Mason's actual testimony included: "[W]hen he came in he, his eyes were just kind of like, they looked kind of hazy like he was tired or something and I asked him. I said 'Are you tired, what's going on' and he said 'Yeah. I'm just tired, I just been working hard,' like that and I said 'Are you sure that's all that it is, you're sure that's everything that's up,' * * *."

8. A.F. was at the facility from September 30, 1993 through July 25, 1994; C.C. was at the facility from August 22, 1994 to June 30, 1995; and J.M was at the facility from September 28, 1994 through June 15, 1995.