STATE of Minnesota, Respondent,

v.

Philip VANCE, Appellant.

No. A05–15.

Supreme Court of Minnesota.

May 25, 2006.

John M. Stuart, State Public Defender, Roy G. Spurbeck, Assistant State Public Defender, Office of the State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, James C. Backstrom, Dakota County Attorney, Kathryn M. Keena, Assistant County Attorney, Hastings, MN, for Respondent.

## OPINION

PAGE, Justice.

On October 5, 2004, a Dakota County jury found appellant Philip Vance guilty of first-degree premeditated murder, first-degree felony murder during an aggravated robbery, and second-degree intentional murder for the shooting death of Khaled Al–Bakri (Al–Bakri). The trial court

judge sentenced Vance to life imprisonment. In this direct appeal, Vance raises a number of issues. He contends that the trial court erred when it denied his motion to admit certain alternative-perpetrator evidence and reverse-*Spreigl* evidence. He also contends that he was denied a fair trial due to the cumulative prejudicial effect of errors by the trial court, including the admission of evidence that witnesses were threatened, felt threatened, or were fearful; the trial court's failure to *sua sponte* give a cautionary instruction with respect to that evidence; and the trial court's failure to *sua sponte* give a limiting instruction with respect to unredacted statements by police officers asserting that Vance was lying. Pro se, Vance argues that: (1) newly discovered evidence entitles him to a new trial; (2) the trial court erroneously excluded introduction of a relevant letter; and (3) the prosecutor committed misconduct when she cried during her opening statement and while presenting the state's case. We affirm.

Tariq Bakkri (Bakkri), Al–Bakri's brother and the owner of Sabreen's Supermarket (Sabreen's) in South Saint Paul, was working at Sabreen's on the afternoon of December 22, 2002. At about 2:00 p.m., Al–Bakri arrived and offered to work the rest of the afternoon and evening. Bakkri left the store between 9:27 p.m. and 9:30 p.m. At about 9:41 p.m., Kathleen Johnson arrived at Sabreen's. When she entered the store, she observed a man in a black mask taking money out of the cash register. She thought she heard the man shout something and she saw him make a "motion like he was going to pull a gun out from his pants." She immediately ran from the store to her car. As she drove away, she observed two people running out of the store. One person was slightly taller than the other. Both were slender and wore baggy pants, hooded sweatshirts, and masks.

Also around 9:30 p.m., four teenagers, including D.M., walked to Sabreen's. As they were walking, one of the teenagers noticed a car parked in an alley just outside of Sabreen's. He described the car as a four-door, "regular sized car," "darkish," shiny, and "tinted gray." Another of the teenagers testified that it was a big, dark, "grayish-black," four-door car. The group observed two men run from the store, jump into the car, and drive away quickly. One of the teens described the two men as wearing baggy clothing, while another observed that the two men wore sweatshirts and dark jeans.

When the teenagers entered the store, they could not locate the clerk. As they waited at the counter, D.M. noticed that the cash register was open. He leaned over the counter and saw Al–Bakri lying on the floor, motionless. He also noticed some blood. The teenagers immediately ran back to D.M.'s home and called the police.

Al–Bakri was pronounced dead at the scene. The cash register indicated that the cash drawer was last opened at 9:35 p.m. for a no-sale transaction. The police found four cartridge casings from a .22 caliber gun on the floor of the store. Two of the cartridges were determined to be Winchester Western brand ammunition and two were CCI brand ammunition. Two bullets were found in Al–Bakri's body, a third was found in a flashlight near his body, and the fourth was not located. The police were unable to find any physical evidence at the scene connecting Vance or any other suspect to the murder and the murder weapon was never recovered.

A number of witnesses testified about Vance's activities before and after the murder on December 22. John Martin, a convicted burglar, testified that on December 22, 2002, he, Vance, and Dominic John-

son were at the Radisson bar in downtown St. Paul between 7 p.m. and 8 p.m. While at the bar, the three discussed the upcoming holidays, and Vance and Johnson discussed making arrangements to buy presents for their children. Martin testified that the three did not discuss a robbery while at the Radisson bar. According to Martin, around 8:30 p.m., Johnson made a phone call from Vance's cell phone to Yvonne and Nicole, two women from South St. Paul. Vance and Johnson told Martin they were going to South St. Paul and invited him along. Martin declined, and the three left the bar. As Martin was heading to his bus, he saw Yvonne and Nicole arrive in a four-door, dark blue Chevy Corsica. The car pulled up to the area where Vance and Johnson were standing.

Melissa Stites, the head bartender at the Radisson bar, testified that on December 22, 2002, Vance, Johnson, and a third man came into the bar around 7:30 p.m. Stites knew both Vance and Johnson, and she testified that they were "more secretive" than usual that evening. When Stites asked them what was going on, Vance replied "that they were getting their plan on." Stites interpreted "getting their plan on" to mean "planning to commit a robbery." Vance and Johnson were in the Radisson bar for about half an hour. As they were leaving, Stites commented that tips were low that night, because Vance and Johnson normally did not tip her. Vance responded, "Don't worry, Baby, when I get back there's going to be plenty of money."

Eric Griffin, an acquaintance of Vance and Johnson, testified that he saw Vance and Johnson arrive at The Buttery, a bar in St. Paul, sometime after 10:00 p.m. on December 22, 2002. Griffin testified that Vance's demeanor was "kind of wild * * * from drinking." Vance was wearing a black hooded sweater and loose-fitting dark blue jeans. Vance told Griffin "that he had did a robbery and it had gone bad, and the guy he was robbing, he had f___ed him up." Vance told Griffin that the robbery had occurred in South St. Paul.

Colleen McManus, the night manager at The Buttery, saw Vance and Johnson outside the bar as she arrived at work sometime between 10:15 p.m. and 10:30 p.m. on December 22. She saw the two get out of a car, which she believed was a four-door, "silver, light green" midsized car. Johnson wore a white hooded sweatshirt, a light blue Starter jacket, dark jeans, and white tennis shoes. Vance wore a dark blue jacket with leather sleeves, dark pants, and a dark hooded sweatshirt. As she entered the bar, she saw Vance and Johnson talking to a group of people, which included Maynard Cross. Vance approached McManus and asked her not to "throw him out" of the bar.[1] Vance and Johnson both seemed nervous. When McManus asked Vance what was wrong he said, "I really f___ed up this time." She responded, "It couldn't have been that bad," and he said, "Oh, yeah, it was. I really did it this time. I did it this time." At one point, Vance started crying, which McManus noted was unusual for him. When she again inquired about his agitation, he said, "Well, I didn't mean for it to happen, it wasn't supposed to happen that way." He then made a motion that McManus interpreted to mean that he had shot someone. When she asked him if he had shot someone, he replied, "It wasn't supposed to happen like that."

---

1. McManus had requested that Vance leave The Buttery a few weeks earlier after Vance punched another person at the bar.

McManus immediately called to report her conversation with Vance to her brother, John McManus, a police officer assigned to the Minnesota Gang Strike Force (MGSF). On December 23, 2002, Stites also reported the conversation she had had with Vance at the Radisson bar to Officer McManus, whom she knew because she had previously provided information to him.

Stites agreed to participate in an undercover investigation of Vance and on January 3, 2003, Stites met with Vance and Johnson at The Buttery. Stites was meeting with Vance under the guise of purchasing a gun from him, with the hope that she would be able to elicit information about the murder. The police had arranged to intercept Stites' conversation with Vance. At some point during the meeting, Vance asked Stites to accompany him to the Lab, another St. Paul bar. Johnson did not accompany Stites and Vance to the Lab.

At the Lab, Stites asked Vance if he had any guns that she could buy and if he would teach her how to shoot. Vance told her that he had four guns. When asked by Stites if he had ever shot anyone, Vance replied that he had "shot a guy two weeks ago over south side five times in the back." Police officers who listened to the conversation corroborated Stites' recollection, with slight variations in the exact words that were used to describe the prior shooting: "Two weeks ago Winchester on the south side * * * I shot a guy five times in the back"; "Yes, about two weeks ago over south, Boo * * * I shot a guy in the back five times"; "he shot somebody in the south side five times and it was a Winchester"; "he had shot a guy five times in the back on the south side * * * I shot a guy two weeks ago on the south side." Vance subsequently sold a .22 caliber handgun to Stites. That gun did not match the weapon used to kill Al–Bakri.

The state also presented testimony from witnesses who were incarcerated with Vance before trial. According to Isaac Hodge, he and Vance were incarcerated at the Sherburne County jail together in 2003. At one point, Vance and Hodge were looking at a newspaper and Vance saw a picture of a man who was later identified as Maynard Cross, one of the people seen talking to Vance at The Buttery the night of the murder. Vance stated, "Man, this dude put my name in some bulls___t." Hodge also testified that Vance, without going into great detail, told him that he was involved in a murder-robbery. In addition, Vance said "it wasn't worth it," which Hodge interpreted to mean that the amount of money that Vance got in the robbery did not justify the murder. Tyrone Crawford, who was housed at the Sherburne County jail around the same time, had a similar conversation with Vance, in which Vance told him that Vance "shot a guy at the grocery store, and he was concerned that that was going to come back on him." Vance also indicated that Cross "was going to testify against him about shooting somebody * * * at a grocery store."

John Nunn was housed at both the Sherburne County jail and Sandstone Prison with Vance. Nunn testified that Vance told him that he had committed a robbery in which someone "got murked," which Nunn interpreted to mean the person was either hurt or shot and killed. Vance told Nunn that he was concerned about the police finding a .22 caliber handgun that had been used in the robbery.

Dontay Reese testified that, while in the Dakota County jail with Vance, he had multiple conversations with Vance about a murder in which Vance was involved. Vance told Reese, in reference to shooting the clerk, that "it wasn't supposed to go down like that" and "[Johnson] said my

name and it wasn't supposed to go down like that. I was zooted, I was drunk and I gave the dude five. And then we got the money and got lit." Vance also told Reese that Johnson, Vance, and Martin were at a bar and left after Johnson called two women, named Yvonne and Tiffany or Nikki, to get a ride to Johnson's cousin's house. Vance told Reese that the women drove a blue Corsica or Accord. Vance and Johnson then met another man and went to a "mom-and-pop store" where Vance and Johnson went inside to commit a robbery. During the robbery, Johnson said Vance's name, so Vance shot the clerk. Vance told Reese he used a "deuce-deuce" to kill the clerk, which Reese interpreted to mean a .22 caliber handgun.

Geronimo Estrada testified that he was incarcerated with Vance at the Ramsey County Workhouse and that they discussed the murder on multiple occasions. According to Estrada, Vance told Estrada that when he entered the store he immediately ran behind the counter and grabbed the clerk, who was startled and did not know what was going on. Vance said the clerk was hysterical and crying saying, "please don't hurt me," and that Vance shot the clerk once or twice in the back of the head. Vance also told Estrada what they took from the store, which included money, cigarettes, plastic bags, lottery tickets, and a telephone. Officer Daniel Vujovich testified that those were the items taken from Sabreen's and that at no time during the investigation was the list of items stolen from Sabreen's disclosed.

At trial, the state introduced recordings of interviews Officer Thomas Kreager and other police officers conducted with Vance during the investigation. During the course of the interviews, the officers accused Vance of lying.

Vance did not testify and presented no witnesses in his defense.

## I.

Evidentiary rulings are within the discretion of the trial court and will not be overturned absent an abuse of that discretion. *State v. Gutierrez,* 667 N.W.2d 426, 436 (Minn.2003). The appellant has the burden of establishing that the trial court abused its discretion and that the error was prejudicial. *Huff v. State,* 698 N.W.2d 430, 435 (Minn.2005).

We first address Vance's claim that the trial court abused its discretion when it excluded certain alternative-perpetrator evidence. Vance contends that the trial court's exclusion of this evidence denied him his constitutional right to present a complete defense. When identity of the perpetrator is at issue, the defendant may present evidence showing that an alternative perpetrator committed the crime. *State v. Blom,* 682 N.W.2d 578, 621 (Minn. 2004). Alternative-perpetrator evidence is admissible if it has an inherent tendency to connect the alternative party with the commission of the crime. *State v. Jones,* 678 N.W.2d 1, 16 (Minn.2004). Once the defendant establishes that the evidence has an inherent tendency to connect the alleged alternative perpetrator to the commission of the crime, " 'it is permissible to introduce evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which would tend to prove the third person committed the act,' in order to cast a reasonable doubt on the state's case." *Id.* (quoting *State v. Hawkins,* 260 N.W.2d 150, 159 (Minn.1977)).

The defendant may also "present evidence of other crimes, wrongs, or bad acts committed by the alleged alternative perpetrator in order to cast reasonable doubt upon the identification of the defendant as the person who committed the

charged crime." *Id.* This evidence is often referred to as reverse-*Spreigl* evidence. *Id.* In order for reverse-*Spreigl* alternative-perpetrator evidence to be admitted, the defendant must, as with all alternative-perpetrator evidence, meet the threshold requirement of connecting the alternative perpetrator to the commission of the crime with which the defendant is charged. *Id.* If this threshold requirement is not met, the reverse-*Spreigl* alternative-perpetrator evidence is not admissible. *See Hawkins.* 260 N.W.2d at 159. If the threshold requirement is met, the defendant must also show by clear and convincing evidence that the alleged alternative perpetrator participated in the reverse-*Spreigl* incident. *Woodruff v. State,* 608 N.W.2d 881, 885 (Minn.2000). If that showing is made, the trial court must then determine whether the reverse-*Spreigl* incident is relevant and material to the defendant's case and whether the probative value of the evidence outweighs its potential for unfair prejudice. *Id.*

Harmless error analysis applies to the erroneous exclusion of alternative-perpetrator and reverse-*Spreigl* evidence. *Blom,* 682 N.W.2d at 622. An error is harmless beyond a reasonable doubt if the verdict rendered is surely unattributable to the error. *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997).

We first address Vance's claim that the trial court erred when it excluded reverse-*Spreigl* alternative-perpetrator evidence involving Cross. At a hearing on the state's motion in limine, Vance offered the following evidence in support of admitting the Cross alternative-perpetrator evidence: (1) a Sabreen's employee told detectives that Cross was in Sabreen's two or three days before Al–Bakri's murder; (2) Bakkri recognized Cross but could not identify whether he had seen Cross at Sabreen's or at a store in St. Paul; (3) Cross matched the height and build of the individuals who killed·Al–Bakri; (4) Cross had knowledge of Sabreen's and was a frequent visitor to South St. Paul; (5) Cross was seen at The Buttery on December 22, 2002; (6) Cross admitted to being at The Buttery with Vance on December 22, 2002; (7) Cross had information about the murder that he claimed to have received from Vance; and (8) Cross was convicted of first-degree murder for the death of a store clerk at a Stop'N'Go in Minneapolis. In the ˙memorandum explaining why the Cross evidence was excluded, the trial court indicated that, "The proffer doesn't come close to the connections established in *Jones* regarding the two alternative perpetrators alleged in that case." We understand this statement to mean that the trial court concluded that Vance failed to present any evidence having an inherent tendency to connect Cross to Al–Bakri's murder.

We agree. While the evidence offered suggests that Cross had knowledge of Sabreen's, was seen in Sabreen's two or three days before Al–Bakri was murdered, and was seen at and admitted to being at The Buttery with Vance on December 22, 2002, none of the evidence places Cross either at or near Sabreen's at the time of Al–Bakri's murder. *See, e.g., State v. Richardson,* 670 N.W.2d 267, 281 (Minn. 2003); *Woodruff,* 608 N.W.2d at 885. Thus, Vance failed to present to the trial court any evidence having an inherent tendency to connect Cross to Al–Bakri's murder. Therefore, the trial court did not abuse its discretion when it excluded the reverse-*Spreigl* alternative-perpetrator evidence related to Cross.

Vance also sought to introduce alternative-perpetrator evidence relating to Lorenzo Eide, Jesse Magnuson, and Michael Smith. In support of the admission of this evidence, Vance proffered the following:

(1) that the day after the shooting Smith called Mary Rose Martinez and told her that he, Magnuson, and Eide had committed the murder; (2) that Samantha O'Reilly told officers that she was with Eide the day after the murder, Eide had a gun and a "couple of hundred dollars worth of drugs the very next night after the shooting," and Eide threatened her on New Years Eve 2002, telling her "he would do to her what he did to the guy at Sabreens [sic];" (3) that Eide, Magnuson, and Smith live in South Saint Paul and had been involved in and convicted of criminal activities; (4) that an individual identified as Michael Balsimo said that his employees had heard rumors that Eide threatened O'Reilly about Eide's involvement in the robbery; and (5) that Eide's alibi was that he was with Magnuson until 11:30 p.m. the night of the robbery.

The trial court determined that Vance had met the threshold foundational requirement with respect to Smith but failed to meet it with respect to Eide and Magnuson. In support of that conclusion, the trial court found that Martinez's statement was an admission on the part of Smith and not the other two, and that Balsimo's statement was inadmissible hearsay. Implicit, but unstated in the trial court's memorandum, is the conclusion that Martinez's statements about Eide and Magnuson also constituted inadmissible hearsay. Although the trial court found O'Reilly's statements about Eide "more difficult" because of the clear and convincing standard for the admission of reverse-*Spreigl* alternative-perpetrator evidence, the trial court concluded that, because it had already determined that the evidence proffered did not have an inherent tendency to connect Eide to Al–Bakri's murder, there was no need to determine whether the reverse-*Spreigl* evidence was clear and convincing. In the end, for reasons unknown, Vance

did not offer the Smith alternative-perpetrator·evidence at trial.

■■■ We conclude that the trial court did not err in finding that Martinez's statement with respect to Magnuson was inadmissible hearsay. According to the proffer, Smith told Martinez that he, Magnuson, and Eide shot Al–Bakri. As an admission against his penal interest, Smith's statement to Martinez met the standard of evidence having an inherent tendency to connect Smith to Al–Bakri's murder and was admissible.

■■■ However, Smith's statement to Martinez, as it pertains to Eide and Magnuson, contains no admission on their part. Thus, Martinez's statement contains only inadmissible hearsay as it relates to Eide and Magnuson. Therefore, we conclude that Smith's statement to Martinez did not have an inherent tendency to connect Eide and Magnuson to Al–Bakri's murder. Because Vance offered no other evidence having an inherent tendency to connect Magnuson to the crime, the trial court properly excluded alternative-perpetrator evidence as it related to Magnuson.

■■■ Vance did, however, offer other evidence with respect to Eide. Vance proffered Balsimo's statement that Balsimo's employees had heard rumors about Eide's involvement in the murder. In addition, he offered O'Reilly's statement about Eide's threats to do to her what "he did to the guy at Sabreens [sic]." The trial court determined that Balsimo's statement was inadmissible hearsay and declined to consider it in determining whether Vance had met the threshold requirement. *See* Minn. R. Evid. 802. In our view, the Balsimo statement fails the inherent-tendency-to-connect test for the same reasons statements Smith made to Martinez about Magnuson failed. As inadmissible hearsay, it

does not have an inherent tendency to connect Eide to Al–Bakri's murder.

■ Unlike Smith's statement to Martinez, the trial court did not consider whether Eide's statement to O'Reilly that "he would do to her what he did to the guy at Sabreens [sic]" was sufficient to satisfy the foundational inherent-tendency-to-connect test for admitting evidence of Eide as an alternative perpetrator. Yet, like the admission Smith made to Martinez, this statement by Eide was, in essence, an admission by Eide that he was involved in Al–Bakri's murder. As such, it had an in inherent tendency to connect Eide to Al–Bakri's murder. Thus, the trial court erred when it excluded alternative-perpetrator evidence regarding Eide.

■ Having concluded that the exclusion of evidence of Eide as an alternative perpetrator was error, we must determine whether the error is harmless error. As stated above, an error is harmless beyond a reasonable doubt if the jury's verdict is surely unattributable to that error. *Juarez*, 572 N.W.2d at 292. Here, the evidence incriminating Vance was strong. Particularly significant are Vance's admissions to a number of witnesses that he committed the murder.

Witness testimony established that Vance was going to South St. Paul a short time before the murder took place and that, immediately before departing for South St. Paul, Vance indicated that he would have "plenty of money" when he returned. Approximately 30 minutes after the murder took place, Vance told Griffin that he had been involved in a robbery

that had "gone bad." Vance later told Stites, who was wearing a listening device for the police, that he had "shot a guy two weeks ago over south side five times in the back." Police officers, who were listening to Vance's conversation with Stites, corroborated that Vance made the statement to Stites. There was also evidence that Vance knew in detail the items that were taken from Sabreen's at the time of the murder, even though that information had not been made known to the public.

Further, Vance made statements to at least five different individuals while he was incarcerated, admitting, in varying degrees, to having committed the murder. Estrada testified that Vance described in detail the events surrounding the murder, including how Vance ran behind the counter and grabbed the store clerk, the store clerk's emotional reaction to the event, and the shooting itself. Vance told Hodge he was involved in a murder-robbery, and Vance told Crawford that he had "shot a guy at the grocery store." Vance told Nunn that he had committed a robbery in which someone "got murked" [2] and expressed concern that the police would find a .22 caliber handgun that had been used in the robbery. Vance also described the events surrounding the murder to Reese, and said that he "gave the dude five" with a "deuce-deuce." [3] Based on Vance's admissions, we conclude that the error in excluding evidence of Eide as an alternative perpetrator did not affect the outcome of the trial and was, therefore, harmless beyond a reasonable doubt. [4]

---

2. Nunn interpreted "murked" to mean that the person was either hurt or shot and killed.

3. Reese interpreted "deuce-deuce" to mean a .22 caliber handgun.

4. We note that Vance's claim that he was denied the right to present a complete defense by the trial court's exclusion of certain alternative-perpetrator evidence is undercut by his failure to introduce at trial alternative-perpetrator evidence the trial court found to be admissible.

The other proffered evidence regarding Eide constitutes reverse-*Spreigl* alternative-perpetrator evidence. Specifically, Vance offered evidence that Eide was "involved in various criminal activities," and O'Reilly's statement that Eide was in possession of a gun and drugs the day after the murder. For this evidence to be admissible, it would have to meet the additional reverse-*Spreigl* alternative-perpetrator requirements. *See Woodruff,* 608 N.W.2d at 885.

■■■■ Vance's bare assertion that Eide was "involved in various criminal activities," without more, fails to meet the clear and convincing requirement for the admission of reverse-*Spreigl* alternative-perpetrator evidence. Based on Vance's proffer, we also conclude that Vance failed to show how evidence of Eide's prior convictions was relevant to this case. Therefore, it was not error for the trial court to exclude that evidence. We need not decide whether the trial court erred when it excluded O'Reilly's statement that Eide was in possession of a gun and drugs the day after Al–Bakri was murdered because, even if the exclusion of that statement was error, the error was harmless beyond a reasonable doubt for the same reasons that the erroneously excluded Eide alternative-perpetrator evidence was harmless.

## II.

We next address Vance's claim that the cumulative effect of the trial court's erroneous admission of evidence that certain witnesses were threatened, felt threatened, or were fearful as a result of testifying, and allowing the jury to hear statements made by police officers during interrogations of Vance in which the officers indicate that he was not being truthful denied

him a fair trial. These claims involve trial testimony from Melissa Stites, Eric Griffin, Officer Vujovich concerning trial witness Geronimo Estrada, who was incarcerated at the Ramsey County Workhouse with Vance, and from Sergeant Phillip Oeffling concerning a search of co-conspirator Johnson's prison cell.

On cross-examination, defense counsel elicited testimony that Stites had relocated since the murder, and that the police had given her approximately $1,500 to assist with relocation expenses and lost wages. On redirect, to explain why the police had assisted Stites with relocation expenses and lost wages, the prosecutor elicited testimony that Stites "felt in fear, fear for [her]self, fear for [her] family." [5]

On cross-examination, Griffin testified that, in exchange for his testimony at trial, the MGSF agreed to recommend to the prosecutor that a drug charge against Griffin be dismissed. On redirect, Griffin testified that he had to leave town because he felt threatened after an incident in which some men stopped him and asked about Vance and Johnson. After Griffin admitted he knew Vance and Johnson, Griffin testified that he thought the men were retrieving something from the back seat of the car, so Griffin ran away. As a result of that encounter, Griffin moved out of state for his safety. [6]

In cross-examining Officer Vujovich, Vance's defense counsel elicited testimony that authorities gave Geronimo Estrada, an inmate in the Ramsey County Workhouse with Vance and a witness at his trial, funds with which to pay telephone charges for calls to his girlfriend and that, over time, Estrada had been given approximately $400. On re-direct, in explaining why Estrada was given the money, Vujo-

---

5. On recross, Stites stated that she had never been directly threatened by Vance.

6. On recross, Griffin stated that he had never been directly threatened by Vance.

vich testified that during their investigation of the Al–Bakri murder, police officers had told Vance, without mentioning Estrada's name, that the police had received additional information about the murder from an inmate at the Ramsey County Workhouse. Shortly thereafter, Estrada was assaulted while at the workhouse and Officer Vujovich requested that the workhouse place him in protective custody, which entails segregation from the other inmates, for Estrada's safety.

Sergeant Oeffling testified, without objection, about an alleged threat against the fiancé of trial witness Regina Hagerman that led to a search of Johnson's prison cell. That search resulted in the discovery of a letter from Vance to Johnson that read, in pertinent part, "never, ever discuss the past." No testimony regarding the alleged threat against Hagerman's fiancé was introduced.

Finally, the state, in its closing, argued that, because of her fears as a result of her testimony, McManus had to quit her job at The Buttery.

At trial, Vance objected to the testimony regarding Griffin and Estrada on relevance grounds. He made a general objection to Stites' testimony. He did not object to Sergeant Oeffling's testimony or the prosecutor's closing argument comment about McManus quitting her job.

Vance argues that there was no evidence linking him to any threat against Stites, Griffin, Estrada, or Hagerman's fiancé, nor was there any evidence introduced at trial indicating that Vance did anything to cause McManus to quit or leave her job. Thus, he argues that, because the threats and fears these individuals felt could not be linked to him, the trial court erred in admitting that testimony. He further argues that, even if the evidence was properly admitted, it was error for the trial court not to provide a "cautionary instruction

ensuring that the jury did not misuse the evidence."

■ A defendant may impeach a witness's credibility by demonstrating that the witness received some benefit in exchange for the witness's testimony. *See State v. Harris,* 521 N.W.2d 348, 352 (Minn.1994) ("the defendant is entitled to impeach the witness' credibility by establishing the witness benefitted [sic] from the [government sponsored protection] program"). At the same time, evidence that the witness's decision to testify resulted in negative consequences is relevant to rebut " 'the appearance of special treatment and improper motivation or bias.' " *Id.* (quoting *United States v. Melia,* 691 F.2d 672, 676 (4th Cir.1982)).

■ The state offered the testimony regarding threats to Stites, Griffin, and Estrada only after Vance's attorney attacked these witnesses' credibility by highlighting benefits each received from the state in exchange for cooperating with the state's prosecution of Vance. Thus, the evidence was relevant for purposes of bolstering the credibility of the witnesses involved.

■ Even when relevant, however, evidence regarding threats will be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *State v. Clifton,* 701 N.W.2d 793, 797 (Minn.2005) (internal quotation marks omitted). Specifically, evidence of negative consequences resulting from the witness's testimony may "be highly prejudicial in that the jury may infer the defendant is connected to the negative consequences." *Harris,* 521 N.W.2d at 352.

■ In *Harris,* we held that the trial court erred when it allowed the prosecutor to focus on threats in the direct examina-

tion of witnesses, repeatedly question multiple witnesses about threats, continuously refer to threat evidence, and create an inference that the defendant was the source of the threats. *Id.* at 352–53. In this case, unlike *Harris,* the evidence of threats against witnesses was not "an important focus of [the prosecutor's] direct-examination of these witnesses." *See id.* at 352. Moreover, the testimony regarding the threats was isolated, admitted only with respect to three witnesses, offered only in response to defense counsel's attacks on the witnesses' credibility, and mentioned only briefly during closing argument when addressing witness credibility. On that basis, we conclude that the probative value of the threat evidence regarding Stites, Harris, and Estrada was not outweighed by the potential for unfair prejudice. In that we conclude the threat evidence was relevant and that its probative value was not outweighed by its potential for unfair prejudice, we also conclude that it was not error for the trial court to admit the evidence.

 At trial, Vance did not object to Sergeant Oeffling's testimony regarding the search of Johnson's cell. The testimony of Sergeant Oeffling, which Vance claims was improperly admitted, was elicited by the state on direct examination. Vance did not cross-examine Sergeant Oeffling or object to the testimony. In his testimony, Sergeant Oeffling gave background information explaining how the state acquired Vance's letter to Johnson. As part of the explanation, he testified that he had searched Johnson's prison cell at the Minnesota Correctional Facility in Stillwater (MCF–STW) as a result of a report from Hagerman that her fiancé, who was housed at MCF–STW, had been threatened by Johnson about Hagerman's involvement in the case. Evidentiary issues to which a party does not object at

trial are forfeited for appeal. *See Blom,* 682 N.W.2d at 617. This court may choose, in its discretion, to review forfeited issues if those issues constitute plain error affecting substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). If the errors constitute plain error, this court may grant a new trial if it is required to ensure the fairness and integrity of the judicial proceeding. *See State v. Morton,* 701 N.W.2d 225, 234 (Minn.2005).

Here, the challenged evidence was offered solely as foundation and context for the letter from Vance to Johnson. Further, the threat was mentioned only in passing and was not referenced again. We therefore conclude that the testimony was properly admitted. Because the testimony was properly admitted, Vance's claim fails the plain error test.

Vance also claims that it was error for the trial court to permit the prosecutor to argue in closing that McManus "had to quit her job." We view Vance's claim as one of prosecutorial misconduct. Our review of the record indicates that there was no evidence presented that indicates that McManus had to quit her job or that she was threatened. The record also indicates that Vance did not object to the statement during the closing argument. Therefore, our review is for plain error. Having carefully considered the record, we are satisfied that to the extent the prosecutor's reference to McManus having to quit her job constituted misconduct, that misconduct did not effect Vance's substantial rights. Thus, Vance is not entitled to any relief.

 Vance further claims that, even if the threat evidence was admissible, the trial court should have given a cautionary instruction regarding the evidence. Vance did not request such an instruction. Ordinarily it is not plain error for the trial court to fail to *sua sponte* give an instruc-

tion. *State v. Vick,* 632 N.W.2d 676, 687 (Minn.2001). In the absence of a request for a cautionary instruction, courts are hesitant to *sua sponte* give an instruction because an instruction may draw additional attention to potentially prejudicial issues. *See, e.g., McCollum v. State,* 640 N.W.2d 610, 617 (Minn.2002) (stating that a no-adverse inference instruction regarding a defendant's decision not to testify draws attention to defendant's silence and should not be given absent a request). Moreover, a defendant may choose not to request an instruction for strategic reasons.[7] Therefore, the trial court did not err in not *sua sponte* giving a cautionary instruction with respect to the threat evidence admitted at trial.

 We next address Vance's claim with respect to the jury being presented with unredacted statements by police officers, made during police interviews with Vance, that Vance was being untruthful in answers to some questions. In a pretrial motion, Vance requested that no police officers be permitted to state an opinion regarding Vance's credibility, reliability, and/or truthfulness of statements made by the defendants or any witnesses. The court declined to issue an order, holding that no one would elicit opinion evidence from police or other witnesses regarding credibility or reliability because to do so would violate the Minnesota Rules of Evidence. The recordings presented to the jury contained multiple police officers' statements that Vance was lying about his

participation in the murder. In addition, after being cross-examined regarding his training in specific interrogation techniques, Officer Kreager testified that the "signals" Mr. Vance was "sending" during the interviews "were not consistent with open honesty."[8] Vance did not object to Officer Kraeger's testimony or to the admission of any police statements presented to the jury, nor did he at any time request a limiting or cautionary instruction regarding the statements made by police. Here, Vance does not argue that admission of the statements was error, he argues only that the court's failure to *sua sponte* give a cautionary instruction was error. Therefore, we will review this claim for plain error.

 When police interviews with a defendant are admitted, statements by police during the interviews are generally admissible to give context to the defendant's statements. *See State v. Lindsey,* 632 N.W.2d 652, 663 (Minn.2001); *State v. Tovar,* 605 N.W.2d 717, 726 (Minn.2000). Courts may give a jury instruction that the statements of police are not evidence. In the absence of a request for a jury instruction limiting comments of the police during an interview, plain error review applies. *See Tovar,* 605 N.W.2d at 725. Further, as discussed earlier, ordinarily it is not plain error for a trial court to fail to *sua sponte* give a cautionary instruction. *Vick,* 632 N.W.2d at 687. On that basis, we conclude, as we did with the threat evidence, that the trial court did not err when

---

7. *See State v. Doppler,* 590 N.W.2d 627, 635 (Minn.1999) (concluding that an attorney's decision not to focus on intoxication as a defense and failure to request an intoxication jury instruction was a matter of trial strategy); *State v. Eling,* 355 N.W.2d 286, 293 (Minn. 1984) (stating that an attorney's decision not to request a cautionary instruction "regarding the possibility of defendant's appearing in handcuffs in view of the jurors" was a tactical

decision that probably reflected the attorney's attempt to avoid calling further attention to the defendant's restraints).

8. While it may have been improper for Officer Kreager to comment that his impression was that Vance's "signals" "were not consistent with open honesty," Vance does not argue that admission of that statement was error.

it did not, *sua sponte*, give a cautionary instruction with respect to the unredacted police statements that Vance was being untruthful.

### III.

Vance raises three additional claims in his pro se brief. He claims that: (1) newly discovered evidence entitles him to a new trial; (2) the trial court erroneously excluded a letter from being introduced at trial; and (3) the prosecutor committed misconduct when she began "weeping" during her opening statement and while presenting the state's case.

 Vance claims he has newly discovered evidence in the form of a letter from Trevor Crawford [9] to Vance allegedly stating that Crawford lied to police to corroborate Cross's claim that Cross did not commit the murder. Vance has not produced the letter. To substantiate a claim for newly discovered evidence, Vance must show:

> (1) the evidence was not known to the defendant or counsel at trial; (2) the failure to learn of the evidence before trial was not due to a lack of diligence; (3) the evidence is material, not merely impeaching, cumulative, or doubtful; and (4) the evidence will probably result in either an acquittal or a more favorable result for the defendant.

*Hooper v. State*, 680 N.W.2d 89, 96 (Minn. 2004).

Vance has not sustained his burden with respect to any of these requirements. Most importantly, because Vance has not made the contents of the letter clear, it is not apparent that "the evidence will probably result in either an acquittal or a more favorable result" for him, and therefore this claim fails.

 Vance next claims that the court erred when it excluded a letter written by Bakkri to Cross offering Cross $3,000 to help convict Vance.[10] The purpose of the letter was to show witness bias. The trial court held that the letter was inadmissible because Vance did not lay proper foundation for its admission. In so holding, the trial court stated that, in order to show that Cross was influenced by the offer of payment, Vance would first have to establish that Cross had received the letter, which Vance failed to do. The court did allow Vance to question Bakkri about the contents of the letter. Bakkri acknowledged that he wrote a letter to Cross but claimed that he gave the letter to the police and he did not think the letter was sent. Bakkri also testified that the letter offered $3,000 to Cross for information about Al–Bakri's death. On this record, we are satisfied that the trial court did not abuse its discretion in excluding the letter.

Finally, Vance claims that the prosecutor "wept" during her opening statement and while presenting the state's case. Beyond his bare assertion, Vance provides no support for this claim, nor has our review of the record identified any support for it. Absent such support, the claim has no merit.

Affirmed.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

9. It is not clear whether Vance is referring to Tyrone Crawford, who testified at his trial, or someone who did not appear at trial.

10. The trial record indicates only that the letter in question offered a reward for information, not for help convicting Vance.